**Joseph F. HARBISON, III dba Joseph F. Harbison III & Associate, Plaintiff,**

v.

**AMERICAN MOTORISTS INSURANCE COMPANY, Defendant.**

**No. CIV. S–04–2542 FCD JFM.**

United States District Court, E.D. California.

June 24, 2009.

Lori Ann Sebransky, Ralph A. Lombardi, Lombardi, Loper & Conant, Oakland, CA, for Plaintiff.

Laura K. Kim, Wayne Booth Littlefield, Musick, Peeler & Garrett, Los Angeles, CA, for Defendant.

*MEMORANDUM AND ORDER*

FRANK C. DAMRELL, JR., District Judge.

This matter is before the court on a motion for summary judgment filed by defendant American Motorists Insurance Company ("defendant" or "AMIC") pursuant to Federal Rule of Civil Procedure 56. In an earlier decision, subsequently reversed by the Ninth Circuit, this court granted AMIC's motion for summary judgment on the ground there was no potential for coverage, and hence AMIC had no duty to defend plaintiff Joseph Harbison ("Harbison"). The Ninth Circuit reversed, finding that AMIC had a duty to defend Harbison in an action brought against Harbison by a former co-counsel because there was a potential for coverage based on various allegations in the com-

plaint. Defendant now moves for partial summary judgment as to plaintiff's claims for breach of the implied covenant of good faith and fair dealing and for punitive damages, arguing that the court can find as a matter of law that its denial of coverage was, at most, a reasonable mistake in judgment in interpreting and applying the policy and thus does not give rise to bad faith liability.

For the reasons set forth below, defendant's motion is DENIED. Triable issues of fact remain as to the reasonableness of defendant's denial of plaintiff's professional liability claim, and thus, summary judgment cannot be entered in defendant's favor on the breach of implied covenant of good faith and fair dealing and punitive damages claims.

## BACKGROUND [1]

### A. The Policy

Joseph F. Harbison, III & Associates is the named insured under a lawyers professional liability insurance policy issued by AMIC, Policy No. QJ 001620 01 (the "Policy"), for the policy period of February 15, 2003 to February 15, 2004, with limits of liability of $1,000,000 per claim and $2,000,000 in the aggregate. (July 13 Order at 2.) Joseph F. Harbison is an insured under the Policy.

Section B of the Policy, "What is Covered," provides in part:

"Subject to all terms and conditions of this policy, we will pay on your behalf those damages and defense expenses arising out of a claim or pre-claim incident that you first become aware of and report to us in writing during the policy period provided that the claim or pre-

claim Incident arises out of your acts, errors or omissions that occurred on or after the prior acts date shown in the Declarations."

(*Id.*) Section A of the Policy, "Definitions," provides in part:

"Whenever used in this policy, the term:

1. Claim means any demand received by you for money, services or any other thing of value arising out of your acts, errors or omissions in providing professional services.

\* \* \* \*

10. Professional services [is defined in relevant part as] services you perform:

a. For a client in your capacity as a lawyer;

\* \* \* \*

(*Id.* at 2–3.) Section C of the Policy, "Defense and Settlement," provides in part: "We will provide for a defense of claims against you seeking damages . . . ." (*Id.* at 3.) Section G of the Policy, "Exclusions," provides in part:

"This insurance does not apply to:

\* \* \* \*

7. Any claim arising out of acts, errors, or omissions that occurred prior to the effective date of this policy if, on or prior to such date, you knew or had a reasonable basis to believe either that a professional duty had been breached or that a claim would be made.

8. Any claim arising out of a criminal, intentionally wrongful, fraudulent or malicious act or omission.

\* \* \* \*

1. In some respects, these facts are taken from the court's prior memorandum and order ruling on AMIC's previous motion for summary judgment: *Harbison v. Am. Motorists Ins. Co.,* No. CIV–S–04–2542 FCD/JFM, 2005 WL 1676897, filed July 13, 2005 (Docket # 16)

("July 13 Order"). Though the parties did not set forth some of these facts on the instant motion, the facts are necessary to provide full context to the issues raised herein. The facts are undisputed as indicated in the July 13 Order.

10. Liability to others which you assume under any contract or agreement."
(*Id.*)

## B. The Klawitter Action

On or about September 2, 1998, Christopher J. Olsen ("Olsen") and Kathleen Klawitter ("Klawitter") entered into a written contingent fee retainer agreement whereby Klawitter retained Olsen to represent her in connection with all of her claims of bodily injuries and alleged damages arising out of an incident on July 23, 1998, which occurred at the Sebastopol Golf Course in Sebastopol, California, in exchange for a certain percentage of any recovery. (*Id.*) On or about January 13, 1999, Olsen filed an action on behalf of Klawitter entitled *Kathleen Klawitter v. Lee Farris, et al.,* Case No. 220841, in California Superior Court for the County of Sonoma (the "Klawitter Action"). (*Id.*)

On or about April 2002, Olsen contacted Harbison to request that Harbison associate into the Klawitter Action as trial counsel. (*Id.* at 4.) Olsen asserts that he and Harbison entered into an agreement, which provided that Harbison would associate into the Klawitter Action as co-counsel and would act as primary trial counsel therein, in exchange for a certain portion of the attorneys' fees recovered in that action. (*Id.*) On or about July 31, 2002, Klawitter signed an "Authorization Pursuant to Rule 2–200 of Professional Conduct" which acknowledged and authorized an agreement between Olsen and Harbison. (*Id.*) On or about June 25, 2002, Harbison formally associated into the Klawitter Action and became co-counsel of record for Klawitter. (*Id.*)

On August 16, 2002, Harbison advised Olsen that Klawitter would be discharging his services in the Klawitter Action and that discharge would affect their fee agreement should Harbison be retained directly by Klawitter in the Klawitter Action. (*Id.*) By letter dated August 12, 2002, Klawitter terminated Olsen as her counsel in the Klawitter Action effective August 13, 2002. (*Id.*) On or about August 13, 2002, Klawitter retained Harbison to solely represent her in the Klawitter Action. (*Id.*)

On or about August 26, 2002, Olsen filed a "Notice of Lien" in the Klawitter Action wherein Olsen claimed a lien for attorneys' fees, costs and expenses on any settlement or judgment in that action. (*Id.*)

In early January 2003, the Klawitter Action was settled for the sum of $775,000. (*Id.*) On or about January 28, 2003, Harbison sent a letter to Olsen requesting that he immediately withdraw the Notice of Lien filed in the Klawitter Action. (*Id.* at 4–5.) Thereafter, Olsen and Harbison exchanged letters, with Harbison generally disputing Olsen's claim of a lien on the Klawitter Action and Olsen demanding payment for expenses and fees to which he asserted he was entitled. (*Id.* at 5.)

On July 24, 2003, the Klawitter Action was dismissed. (*Id.*) Neither Olsen nor Harbison have received any portion of the attorneys' fees recovered in the settlement paid in the Klawitter Action, which have been held in a trust account. (*Id.*)

## C. The Olsen Action

Unbeknownst to Harbison, on or about February 3, 2003, Olsen filed an action entitled *Christopher J. Olsen v. Joseph F. Harbison, III, doing business as Law Offices of Joseph F. Harbison, III & Associates,* Ventura County Superior Court Case No. SC035315 ("the Olsen Action"), asserting claims for quantum meruit and breach of contract. (*Id.*) Also unbeknownst to Harbison, on or about April 17, 2003, Olsen filed a First Amended Complaint in the Olsen Action, asserting causes of action for (1) quantum meruit, (2) breach of contract, (3) fraud, (4) intentional interference with contractual relationship, breach of fiduciary duty, and (6) declaratory relief and

imposition of constructive trust. (*Id.* at 6.) Harbison first became aware of the Olsen Action on April 29, 2003, when a copy of the First Amended Complaint was delivered to his office. (*Id.* at 5.) Harbison demurred to the First Amended Complaint, and the court sustained without leave to amend the demurrer as to Olsen's quantum meruit cause of action. (*Id.* at 6.)

On May 2, 2003, Harbison tendered the Olsen Action to AMIC for defense and indemnity under the Policy. (*See id.* at 5.) The tender was received by AMIC on May 6, 2003. (Def.'s Resp. to Pl.'s Stmt. of Undisputed Facts ["DRSUF"], filed June 5, 2009 [Docket # 51–2], ¶ 34.) Two days later, on May 8, 2003, Jeff Goode of AMIC sent an email to Harbison denying coverage. (*Id.*) Harbison contends that this denial was done without any investigation of the claim. (*Id.*) AMIC disputes this contention. (*Id.*) AMIC maintains Mr. Goode assumed Harbison's alleged conduct constituted "professional services," and acknowledged that Olsen's claims for general and consequential damages were potentially covered under the Policy. (DRSUF ¶ 35.) AMIC's denial was based solely on the policy's exclusion for any claim "arising out of a criminal, intentionally wrongful, fraudulent or malicious act or omission." (*Id.*)

On May 15, Harbison wrote to AMIC contesting the denial. (DRSUF ¶ 37.) AMIC referred the matter to coverage counsel, Waxler, Carner, Weinreb & Brodsky. (DRSUF ¶ 38.) Mr. Goode did no further independent investigation or evaluation of the claim. (*Id.*) On May 22, 2003, Harbison received a letter from AMIC's coverage counsel, Andrew Waxler. (DRSUF ¶ 39.) Mr. Waxler requested that Harbison provide copies of certain correspondence between himself and Olsen, which referred to the lien and fee issues. (*Id.*) On May 29, 2003, Harbison wrote to Mr. Waxler. (DRSUF ¶ 40.) He explained that the documents Mr. Waxler requested referred to "only one part of a much larger picture," and invited him to meet and review the Olsen file. (*Id.*) AMIC or its counsel never met with Harbison to discuss the Olsen claim, and Harbison contends that AMIC never reviewed the Olsen case files. (DRSUF ¶ 42.) AMIC disputes this contention. (*Id.*)

Harbison provided the requested correspondence on June 10, 2003. (DRSUF ¶ 43.) Harbison again urged AMIC to review the entire Olsen file, not just a few pieces of correspondence, and to meet with him so AMIC's investigation would be "thorough, accurate and meaningful." (*Id.*) Harbison did not hear from AMIC for six weeks, and wrote to Mr. Waxler on July 21, 2003, requesting a response. (DRSUF ¶ 44.)

On July 22, 2003, AMIC again denied all obligations under the policy. (DRSUF ¶ 45.) Mr. Goode conceded this July 22 response was untimely. (DRSUF ¶ 46.) By letter of August 20, 2003, Harbison explained why AMIC's coverage analysis was wrong and implored AMIC to investigate the loss and reconsider its position. (DRSUF ¶ 47.) On September 1, 2003, Harbison received a letter from Mr. Waxler. (DRSUF ¶ 48.) He suggested that Harbison look through all of the Olsen files himself and send him any documents that support Harbison's request for coverage. (*Id.*) On September 9, 2003, Harbison wrote back to AMIC, expressing his frustration with AMIC, and contending that AMIC refused to review any information or give any real consideration to its duty to defend. (DRSUF ¶ 49.) AMIC disputes this contention. (*Id.*)

Subsequently, Olsen filed a Second Amended Complaint asserting causes of action for (1) breach of contract, (2) fraud and deceit, (3) intentional interference with contractual relationship, and (4) imposition

of constructive trust. (July 13 Order at 6.) On or about March 30, 2004, Harbison forwarded the Second Amended Complaint in the Olsen Action to AMIC and again requested defense and indemnity under the Policy. (*Id.*) On or about July 23, 2004, AMIC denied coverage. (*Id.*) AMIC provided the following grounds for denial of coverage: (1) the Olsen Action seeks the return of legal fees, costs and expenses from Harbison, which do not constitute covered damages as defined by the Policy; (2) the Olsen Action seeks punitive damages, which do not constitute covered damages as defined by the Policy; (3) the Policy excludes coverage for any claim arising out of an intentionally wrongful, fraudulent or malicious act or omission, and the Olsen Action seeks to hold Harbison liable for intentionally wrongful, fraudulent and malicious acts; (4) business disputes between lawyers over fees do not constitute the rendering of "professional services" as defined by the Policy; (5) the claim was not first made and reported to AMIC during the policy period; and (6) prior to the effective date of the Policy, Harbison had a reasonable basis to believe that a claim would be made against him. (*Id.*)

On September 1, 2004, Harbison wrote to AMIC, giving it a final opportunity to honor its defense obligation. (DRSUF ¶ 54.) On December 1, 2004, Harbison filed a complaint in this court against AMIC, in which he asserted claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory relief. On July 12, 2005, 2005 WL 1676897, the court ruled on Harbison's and AMIC's cross-motions for summary judgment. (Pl.'s Resp. to AMIC's

Stmt. of Undisputed Facts ["PRSUF"], filed May 29, 2009 [Docket # 44], ¶ 14.) The court granted AMIC's motion, holding AMIC did not have a duty to defend Harbison in the Olsen Action because Olsen's claims did not arise out of an error or omission in providing professional services, since Olsen was not Harbison's client and could not assert a malpractice claim against him; accordingly, the court found there was no potential for coverage under the Policy. Harbison appealed, and the Ninth Circuit reversed this court's decision, finding a potential for coverage as a result of Olsen's allegations that Harbison's tortious statements to Klawitter, a client, made during Harbison's provision of professional services to her, interfered with the contractual relationship between Olsen and Klawitter. (PRSUF ¶¶ 15–16).[2]

## STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). If the moving party

---

**2.** The parties' various objections to each other's evidence are overruled. (*See* Pl.'s Objs. to Evid., filed May 29, 2009 [Docket # 46]; Def.'s Objs. to Evid., filed June 5, 2009 [Docket # 51–3].) In large part the objections are moot as the court does not rely on the objected-to evidence; however, to the extent certain objected-to evidence is cited above, the court overrules the relevant party's objection.

does not bear the burden of proof at trial, he or she may discharge his burden of showing that no genuine issue of material fact remains by demonstrating that "there is an absence of evidence to support the non-moving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. Once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Genuine factual issues must exist that "can be resolved only by a finder of fact, because they may reasonably be resolved in favor of either party." *Id.* at 250, 106 S.Ct. 2505. In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630–31 (9th Cir.1987) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). The evidence presented by the parties must be admissible. Fed. R.Civ.P. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. *See Falls Riverway Realty, Inc. v. City of Niagara Falls,* 754 F.2d 49, 57 (2d Cir. 1985); *Thornhill Publ'g Co., Inc. v. GTE Corp.,* 594 F.2d 730, 738 (9th Cir.1979).

### ANALYSIS

■ AMIC moves for summary judgment, arguing it did not breach the covenant of good faith and fair dealing when it denied Harbison coverage in the Olsen Action. "In addition to the duties imposed on contracting parties by the express terms of their agreement, the law implies in every contract a covenant of good faith and fair dealing." *Egan v. Mutual of Omaha Ins. Co.,* 24 Cal.3d 809, 818, 169 Cal.Rptr. 691, 620 P.2d 141 (1979) (citations omitted). "The insurer, when determining whether to settle a claim, must give at least as much consideration to the welfare of its insured as it gives to its own interests." *Id.* "The implied covenant imposes obligations not only as to claims by a third party but also as to those by the insured." *Id.* "[When] the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." *Id.* "For the insurer to fulfill its obligation not to impair the right of the insured to receive the benefits of the agreement, it again must give at least as much consideration to the latter's interests as it does to its own." *Id.* at 818–19, 169 Cal.Rptr. 691, 620 P.2d 141. "To protect [the insured's] interests it is essential that an insurer fully inquire into possible bases that might support the insured's claim ... an insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." *Id.* at 819, 169 Cal.Rptr. 691, 620 P.2d 141.

■ AMIC contends that it did not breach its covenant of good faith and fair dealing when it denied plaintiff coverage in the Olsen Action. Specifically, AMIC argues that (1) it conducted a reasonable and adequate investigation of the claim, (2) it handled the claim in a timely manner, (3) the court's granting of summary judgment for AMIC is probative of the reasonableness of AMIC's coverage position, (4) the genuine dispute doctrine can and does apply to a legal dispute over the duty to defend, and (5) punitive damages against AMIC are not justified. In response, Harbison contends that AMIC acted in bad faith when refusing to provide coverage for his claim.

## A. *Breach of the Implied Covenant of Good Faith and Fair Dealing*

 The implied covenant of good faith and fair dealing is breached when an insurer delays or denies payment of policy benefits unreasonably or without proper cause. *Jordan v. Allstate Ins. Co.*, 148 Cal.App.4th 1062, 1072, 56 Cal.Rptr.3d 312 (2007); *see also Wilson v. 21st Century Ins. Co.*, 42 Cal.4th 713, 723, 68 Cal. Rptr.3d 746, 171 P.3d 1082 (2007) ("an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable."). The "key to a bad faith claim is whether or not the insurer's denial of coverage was reasonable . . . . [The] reasonableness of an insurer's claim-handling conduct is ordinarily a question of fact." *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1009–10 (9th Cir. 2004) (citing *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1161 (9th Cir.2002)).

Harbison argues that defendant breached the implied covenant of good faith and fair dealing because it acted unreasonably in denying plaintiff's claim. First, Harbison claims that AMIC wrongfully concluded that the Olsen complaint stated no potential for coverage and relieved it of its duty to defend without a full or proper investigation; specifically, Harbison contends that AMIC wrongfully reached this conclusion without conducting any investigation of his claim. However, AMIC maintains that the complaints and attached exhibits by themselves contained enough information to comprehend the nature of the tendered claim, and therefore, while it may have reached an erroneous conclusion, it was an objectively reasonable judgment as to its duty to defend. Second, Harbison claims that AMIC's response to its claim was untimely. AMIC contends that its original denial of coverage was timely, and that subsequently it simply maintained its original position in response to Harbison's efforts to have the company do otherwise. Third, Harbison argues that the genuine dispute doctrine does not apply to third-party duty to defend cases, and thus does not shield AMIC from liability. AMIC responds that the genuine dispute doctrine can and does apply to a legal dispute over the duty to defend. Finally, Harbison claims that AMIC is not entitled to summary adjudication of his punitive damages claim, as there is clear and convincing evidence of oppression, fraud or malice within the meaning of Cal. Civil Code § 3294(a). AMIC argues that punitive damages against it are unjustified because Harbison cannot show that AMIC's actions amounted to oppressive, fraudulent or malicious conduct.

### 1. Genuine Dispute Doctrine

Because if applicable to third-party duty to defend cases, the genuine dispute doctrine can provide a complete defense for AMIC, the court addresses this issue first.

 An insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. *Wilson v. 21st Century Ins.*, 42 Cal.4th 713, 723, 68 Cal. Rptr.3d 746, 171 P.3d 1082 (2007). An insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract. *Id.* (quoting *Chateau Chamberay Homeowners Assn. v. Associated Int'l Ins. Co.*, 90 Cal. App.4th 335, 347, 108 Cal.Rptr.2d 776 (2001)). However, "[t]he genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained

in good faith and on reasonable grounds." *Id.* (emphasis in original). Furthermore, the genuine dispute doctrine does not "alter the standards for deciding and reviewing motions for summary judgment." *Id.* at 724, 68 Cal.Rptr.3d 746, 171 P.3d 1082. As the *Wilson* court explained:

> The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable .... On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably. Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues ... as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.

*Id.* at 724, 68 Cal.Rptr.3d 746, 171 P.3d 1082 (citations omitted).

One court has found that the genuine dispute doctrine may be applicable to third party, duty to defend cases. *Delgado v. Interinsurance Exch. of the Auto. Club of So. Cal.,* 152 Cal.App.4th 671, 691–92, 61 Cal.Rptr.3d 826 (2007) (on appeal). There, the court discussed whether the genuine dispute doctrine applied to third party cases involving an insurer's refusal to provide a defense, stating in *dicta* that if the case involved a legal dispute over the insurer's duty to defend, then the genuine dispute doctrine would probably apply, but if the case involved a factual dispute, then the very existence of that dispute created the potential for coverage, thereby establishing the duty to defend. *Id.* at 843–44. The *Delgado* court held that a legal dispute arises when there is a question whether the undisputed facts constitute an "occurrence" under the policy, or when coverage can be determined as a matter of law, based solely on interpretation of the contract. *Id.* at 842. By contrast, the court identified a factual dispute as one in which the determination of coverage turns on disputed facts. *Id.*

AMIC contends that the dispute with Harbison over the duty to defend is purely legal, and therefore the genuine dispute doctrine applies. However, as an initial matter, the court notes that no court has applied the genuine dispute doctrine to a third-party, duty to defend case. Indeed, in *Delgado* the court found that the genuine dispute doctrine did not apply to the facts of that case, because a factual dispute existed as to coverage, rather than a purely legal dispute. *Delgado,* 152 Cal.App.4th at 844, 61 Cal.Rptr.3d 826. Furthermore, despite the *Delgado* court's finding that the genuine dispute doctrine may apply if the dispute over coverage is purely legal, this court is not convinced that the doctrine should ever properly apply where there is dispute as to coverage, legal or factual. This is because where there is the potential for coverage, an insurer's duty to defend is triggered. *Montrose Chem. Corp. v. Superior Court,* 6 Cal.4th 287, 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (1993). By definition, the genuine dispute doctrine is only applicable where there is "a genuine issue as to the insurer's liability under the policy." *Chateau Chamberay,* 90 Cal.App.4th at 347, 108 Cal.Rptr.2d 776. Because the existence of a genuine dispute as to the insurer's liability indicates that there is at least a potential for coverage, the existence of a genuine dispute is itself enough to trigger the insurer's duty to defend. Accordingly, this court finds that the genuine dispute doctrine appears wholly incompatible with duty to defend cases.

However, even assuming arguendo that the genuine dispute doctrine is applicable

to duty to defend cases, the court nevertheless finds that summary judgment in favor of AMIC pursuant to the genuine dispute doctrine is precluded under *Wilson*. *See Wilson*, 42 Cal.4th 713, 68 Cal. Rptr.3d 746, 171 P.3d 1082. Here, both parties to the dispute have advanced reasonable positions with respect to Harbison's bad faith claim. Harbison contends that AMIC denied coverage without any investigation of the claim, and that AMIC continually refused to examine additional documents that would allegedly have revealed the potential for coverage and thereby triggered AMIC's duty to defend. Viewing the facts in the light most favorable to plaintiff, a jury could conclude that AMIC acted unreasonably in refusing to defend Harbison. Because there is a triable issue of fact as to whether AMIC's denial of benefits was done reasonably and in good faith, under *Wilson*, the court may not grant AMIC's motion for summary judgment as to Harbison's bad faith claim.

### 2. Improper or Inadequate Investigation

AMIC contends that it conducted a reasonable and adequate investigation of Harbison's claim with respect to the Olsen Action, and therefore it is entitled to summary judgment on Harbison's bad faith claim.

 The insurer's duty to protect the insured's interests obligates it to investigate a claim thoroughly. "Among the most critical factors bearing on the insurer's good faith is the adequacy of its investigation of the claim. '[T]he covenant of good faith and fair dealing implied in all insurance agreements entails a duty to investigate properly submitted claims.'" *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.*, 78 Cal.App.4th 847, 879–80, 93 Cal.Rptr.2d 364 (2000). "Though some authority tends to equate a bad faith failure to investigate with negligence, the better view appears to be that

it must rise to the level of unfair dealing." *Id.* at 880, 93 Cal.Rptr.2d 364. "An unreasonable failure to investigate amounting to such unfair dealing may be found when an insurer fails to consider, or seek to discover, evidence relevant to the issues of liability and damages." *Id.* If the insurer becomes aware of, or if the third party lawsuit pleads, facts giving rise to the potential for coverage under an insuring agreement, an insurer has a duty to defend. *Waller v. Truck Ins. Exchange*, 11 Cal.4th 1, 19, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). Facts extrinsic to the complaint give rise to a duty to defend when they reveal a possibility that the claim may be covered by the policy. *Id.* The duty to defend should be determined by reference to the policy, the complaint, and all facts known to the insurer from any source. *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. *Amadeo v. Principal Mut. Life Ins. Co.*, 290 F.3d 1152, 1164 (9th Cir. 2002). Finally, "to prevail [on the duty to defend], the insured must prove the existence of a *potential for coverage*, while the insurer must establish *the absence of any such potential.* In other words, the insured need only show that the underlying claim *may* fall within policy coverage; the insurer must prove it *cannot.*" *Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153 (emphasis in original).

Here, Harbison argues that AMIC, in bad faith, failed to conduct any investigation prior to denying Harbison coverage. After this initial denial, Harbison wrote to AMIC contesting the denial. Harbison contends that instead of calling him to better understand the nature of the dispute, AMIC merely asked for certain copies of correspondence pertaining to the lien and fee issues, which represented

"only one part of a much larger picture." (DRSUF ¶ 40.) Harbison claims that: (1) he invited AMIC to meet with him to review the Olsen file, which AMIC refused; (2) AMIC's limited request for his correspondence with Olsen constituted its entire investigation of the claim, and that this correspondence had nothing to do with the tort allegations and associated damages that constituted the basis for coverage; (3) he again urged AMIC to review the entire file, and to meet with him in order to ensure the investigation was thorough, accurate, and meaningful; (4) upon AMIC's confirmation of its earlier denial of coverage, Harbison again wrote AMIC and explained why he thought AMIC's coverage analysis was wrong, and again asked AMIC to conduct a more thorough investigation; (5) AMIC responded by asking Harbison to send it any documents that supported his request for coverage; and finally, (6) after Harbison tendered Olsen's Second Amended Complaint, AMIC again denied any obligation to defend or indemnify Harbison with respect to the Olsen Action.

In contrast, AMIC argues that: (1) it reasonably investigated Harbison's claim by thoughtfully reviewing the complaint and the insurance policy before denying coverage; (2) it had enough information from the multiple complaints and attached exhibits in the Olsen Action to comprehend the nature of the tendered claim, and that further investigation would have been unnecessary; (3) no amount of factual investigation would have changed its analysis that a fee dispute between two attorneys was not covered under the lawyer's profes-

sional liability policy that it issued to Harbison; and (4) rather, its denial of coverage turned upon the policy language and the allegations of the complaints, and this constituted a reasonable investigation of the claim.

Based on the above assertions proffered by both Harbison and AMIC, triable issues of material fact exist as to whether AMIC conducted a proper and adequate investigation of Harbison's claim. While it is true that the insurer need not "turn over every rock or look in every nook and cranny" in search of a valid claim, it nevertheless has a duty to defend where it becomes aware of facts giving rise to a potential for coverage. *See Waller*, 11 Cal.4th at 19, 44 Cal.Rptr.2d 370, 900 P.2d 619.

AMIC also states that after reviewing Harbison's complaint, it concluded that the policy's exclusions applied to the Olsen Action. However, the insurer may not limit its inquiry to the complaint; rather, the duty to defend is determined by reference to the policy, the complaint, and all facts known to the insurer from any source. *See Montrose*, 6 Cal.4th at 300, 24 Cal.Rptr.2d 467, 861 P.2d 1153.[3] Furthermore, "the insurer's early closure of an investigation and unwillingness to reconsider a denial when presented with evidence of factual errors will fortify a finding of bad faith." *See Shade Foods*, 78 Cal. App.4th at 880, 93 Cal.Rptr.2d 364. After initially denying Harbison's claim in merely two days, AMIC maintained its position until the Ninth Circuit ruled otherwise. Thus, triable issues of fact exist as to whether AMIC unreasonably denied cover-

---

**3.** The court notes that AMIC cites *American Int'l Bank v. Fid. & Deposit Co. of Md.* for the proposition that an insurer's review of the complaint and policy alone constitutes an adequate investigation of an insured's claim. *Am. Int'l*, 49 Cal.App.4th 1558, 1565, 57 Cal. Rptr.2d 567 (1996). However, that case is factually distinguishable from the situation here, for there the court found that the insurer's investigation, limited to an examination of the complaint and the policy, was sufficient because the parties could not reasonably have expected that coverage would include plaintiff's uncovered economic losses. For the reasons set forth above, such is not the case here.

age without conducting a proper investigation as to Harbison's claim.

Accordingly, because triable issues of fact exist regarding whether AMIC failed to properly investigate Harbison's claim, AMIC's motion for summary judgment must be DENIED on this basis.

### 3. Untimely Investigation

Because the court finds triable issues of fact pertaining to the reasonableness of AMIC's investigation of Harbison's claim, it is unnecessary to discuss Harbison's claim that AMIC's investigation was untimely.

### 4. The Court's Previous Granting of Summary Judgment

■ AMIC claims that this court's previous grant of summary judgment in its favor is probative of the reasonableness of AMIC's coverage position.

■ "[P]ublic policy mandates that the reasonableness of the insurer's decision must be evaluated as of the time it was made, and that no subsequent court ruling can be the justification for the decision." *Filippo Industries, Inc. v. Sun Ins. Co. of N.Y.*, 74 Cal.App.4th 1429, 1441, 88 Cal. Rptr.2d 881 (1999). "[If the trial court's previous ruling was considered presumptively reasonable] there could be no question of bad faith. Such a presumption would have the practical effect of denying the insured its right to appeal the trial court ruling because, even if the trial court were reversed, the initial finding would preclude bad faith as a matter of law .... such a conclusion in the insurance context, where legal knowledge is not a prerequisite, is unfounded." *Id.*

AMIC cites *Morris v. The Paul Revere Life Ins. Co.* for the proposition that "[t]he fact that a court interpreted the law in the same manner as the insurer is probative of the reasonableness, though not necessarily correctness, of the insurer's coverage position." 109 Cal.App.4th 966, 976, 135 Cal.

Rptr.2d 718 (2003). However, *Morris* is distinguishable from the current case because there, the court was deciding the reasonableness of an insurer's coverage decision in light of conflicting case law in which under analogous circumstances, some courts had decided in favor of the insurer and others had decided in favor of the insured. *Id.* Because various courts disagreed with each other on this point of law, the *Morris* court determined that the insurer, acting with "the highest courts of several jurisdictions, as well as two California Courts of Appeal, in its corner," was not unreasonable in its coverage decision. *Id.*

Such is not the case here. This is not a situation in which the insurer faced the difficult question of whether an insured's claim was covered in light of conflicting case law. Rather, AMIC denied Harbison coverage in spite of the well-established principle that where there is a bare potential or possibility of coverage, the duty to defend is triggered. *See Montrose*, 6 Cal.4th at 299–300, 24 Cal.Rptr.2d 467, 861 P.2d 1153. Having denied that duty, AMIC must now face Harbison's bad faith claim. The court's previous ruling granting summary judgment to defendant does not provide defendant a defense, nor is it admissible evidence supporting the reasonableness of defendant's denial of coverage.

Thus, the court finds that under *Filippo Industries*, its prior decision in favor of AMIC's motion for summary judgment does not preclude a finding of bad faith in AMIC's denial of coverage.

### B. *Punitive Damages*

■ AMIC argues that there are no facts supporting Harbison's entitlement to punitive damages. Civil Code § 3294, subdivision (a), authorizes recovery of punitive damages in a tort action if there is clear and convincing evidence that the de-

fendant has been guilty of "oppression, fraud, or malice." *Shade Foods v. Innovative Products Sales & Marketing, Inc.,* 78 Cal.App.4th 847, 890–91, 93 Cal.Rptr.2d 364 (2000). In insurance cases, punitive damages can be most plausibly justified by a finding of oppression or malice. *Id.* at 891, 93 Cal.Rptr.2d 364. "Oppression" is defined to mean "despicable conduct that subjects a person to cruel and unjust hardship in conscious disregard of that person's rights." *Id.* "Malice" is defined to mean "despicable conduct which is carried on by the defendant with a willful and conscious disregard of the rights or safety of others." *Id.* "Used in its ordinary sense, the adjective 'despicable' is a powerful term that refers to circumstances that are 'base,' 'vile,' or 'contemptible.'" *Id.* With regard to evidence required for the recovery of punitive damages, the same evidence is relevant to both the finding of bad faith and the imposition of punitive damages, but "[t]he conduct required to award punitive damages for the tortious breach of contract is of a different dimension [than that required to find bad faith]." *Id.* "The evidence in support of the award of punitive damages must satisfy a distinct and far more stringent standard." *Id.* Civil Code § 3294 requires proof "by clear and convincing evidence" that the defendant is guilty of oppression, fraud, or malice. *Id.* "Clear and convincing evidence requires a finding of high probability .... '[the evidence must be] so clear as to leave no substantial doubt'; 'sufficiently strong to command the unhesitating assent of every reasonable mind.'" *Id.*

In deciding whether the insurer's coverage decision met the standard of conduct necessary for recovery of punitive damages, the court in *Shade Foods* noted that an insurer's conduct might meet the standard for "malice" or "oppression" and yet still not be so contemptible to qualify as "despicable." *Shade Foods,* 78 Cal. App.4th at 892, 93 Cal.Rptr.2d 364. In

that case, the court also noted that a record that presents a close case with regard to the sufficiency of the evidence of bad faith will inevitably provide a tenuous basis for supporting an award of punitive damages, since a finding of bad faith and punitive damages depends on inferences drawn from the same evidence. *Id.* at 893, 93 Cal.Rptr.2d 364. As the court stated, a "marginally sufficient case of bad faith is not likely to prove malice or oppression by clear and convincing evidence." *Id.* at 909–10, 93 Cal.Rptr.2d 364.

Nevertheless, some courts have found that failure to conduct an adequate investigation was sufficient to support jury findings or withstand summary judgment with regard to punitive damages. *See Amadeo,* 290 F.3d at 1165 (stating that insured's claim withstood summary judgment with regard to punitive damages because there was sufficient evidence that denial of the plaintiff's claim went beyond "the unfortunate result of poor judgment," resulting instead from a plainly unreasonable interpretation of the policy and deliberately restricted investigation in an attempt to deny benefits); *see also Tibbs v. Great American Ins. Co.,* 755 F.2d 1370, 1375 (9th Cir.1985) (finding sufficient evidence to support punitive damages where insurer conducted little or no investigation into its duty to defend, did not compare the plaintiff's claim with the insurance company's policy, and did not inspect the policy itself).

 Interpreting the facts of the present case in the light most favorable to plaintiff, the court finds sufficient evidence for Harbison's punitive damages claim to survive summary judgment. Harbison claims that AMIC adopted an unreasonable coverage position, failed to conduct *any* investigation, or if it did conduct an investigation, limited its inquiry to information that would allow it to deny Harbi-

son's claim, and obstinately persisted in its initial wrongful position. Harbison also contends that in failing to conduct a reasonable investigation, AMIC refused to look into the facts or files that Harbison offered, instead limiting its inquiry to the complaints and limited correspondence between Harbison and Olsen. Thus, the court finds that there is a triable issue of fact as to whether AMIC's denial of coverage was conducted in bad faith to the extent that its conduct constituted "despicable" "oppressive, fraudulent, or malicious" conduct.

## CONCLUSION

For the foregoing reasons, AMIC's motion for summary judgment of Harbison's breach of the implied covenant of good faith and fair dealing and punitive damages claims is DENIED.

IT IS SO ORDERED.