Filed 8/31/15  Benham v. First American Home Buyers Protection CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| ALICE J. BENHAM,<br><br>        Plaintiff and Appellant,<br><br>        v.<br><br>FIRST AMERICAN HOME BUYERS<br>PROTECTION CORPORATION,<br><br>        Defendant and Respondent. | A141034<br><br>(Contra Costa County<br>Super. Ct. No. MSC1102389) |

Alice J. Benham had a home warranty plan with First American Home Buyers Protection Corporation (First American).  Benham's furnace, which was covered by the plan, failed.  She rejected the contractor selected by First American and hired her own contractor to replace her furnace.  She filed a lawsuit against First American when it refused to reimburse her for the total amount she paid to replace the furnace. Subsequently, First American paid Benham the sum she had demanded, and Benham filed a first amended complaint against First American for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.).  First American moved for summary judgment, which the trial court granted.

Benham appeals and contends, among other things, that the home protection plans are insurance, First American violated various regulations, and she suffered emotional distress damages.  We decline to decide whether home protection plans are insurance

1

because such a determination is not necessary to our holding.  Benham cannot show any damages on her breach of contract claim.  The evidence shows as a matter of law that First American acted reasonably when complying with the terms of the contract, defeating Benham's breach of the covenant of good faith and fair dealing claim.  Finally, Benham suffered no economic injury and has no standing to bring a UCL claim.  Accordingly, we affirm.

## BACKGROUND

Benham purchased a home in the City of Richmond in 2010.  Her real estate broker purchased for her benefit a home warranty plan with First American (First American's home warranty plan), with an effective date of August 6, 2010.  Such plans typically cover the major systems and appliances in a customer's home.  Benham acknowledged receiving this plan, but stated she did not read it when she received it.  First American's letter with the First American home warranty plan advised her to review it.

First American's home warranty plan provided that it "covers only the items mentioned as covered and excludes all other."  It stated that First American "will not reimburse you for services performed without approval."  With certain exclusions, First American's home warranty plan covered heating.[1]

A provision in First American's  home warranty plan under the heading of "Limits of Liability" stated:  "The Company will not be responsible for any corrections, repairs, replacements, upgrades, inspections or other additional costs to comply with federal, state or local laws, utility regulations, zoning or building codes. . . .  The Company will not be responsible for alterations or modifications made necessary by existing equipment or

---

[1]  Under coverage for heating, the home warranty plan specified radiators; heating elements; vent blower assembly; baseboard convectors; gas, electrical, oil furnaces; switches, wiring and relays; gas valve; heat pump refrigerant recharging; motors; printed circuit boards; burners; hydronic circulating pumps; heat exchangers; heat pump; thermostats and thermostat sub-base.

installing different equipment except where noted in the Central Air Conditioning (Ducted) section of this contract. . . ."

One paragraph in First American's home warranty plan under the heading of "Customer Service" read: "Homeowner and Company may agree on payment of cash in lieu of repair or replacement. Payment will be made based on Company's negotiated rates with its suppliers, which may be less than retail."

On October 18, 2010, the furnace in Benham's home failed. She called Atlas Heating & Air Conditioning (Atlas), and an Atlas technician came to her home the following day. After meeting with Atlas, Benham called First American and reported that her furnace was not functioning. First American set up a work order for California Express Enterprises to inspect the furnace on October 20, 2010. The technician arrived at 10:30 a.m., on October 20, but Benham was not there.

Benham requested a new contractor, and First American sent SA Heating & Air Conditioning (SA Heating) to her home on October 21, 2010. SA Heating inspected the furnace and reported several problems, including a cracked heat exchanger, a carbon monoxide leak, and an incorrect thermostat. SA Heating recommended replacement of the furnace and First American agreed to replace it. SA stated that a number of modifications would be required to install a replacement furnace. On October 22, 2010, First American placed a purchase work order with Goodman Distribution for a replacement furnace at 90 percent efficiency for the pre-tax price of $472.00. First American had a contract with SA Heating to provide service to its customers for a flat fee of $155.00.

On October 22, 2010, First American sent Benham a letter stating that it had authorized SA Heating to replace the heater. The letter stated: "The price of the heater is $472.00[,] the tax is $46.02, and the labor rate is $155.00 to install. We do deduct the time into the job which is $55 and that totals your cash out to $618.00." It specified that Benham would have to pay a total of $1,200 for costs not covered in the home warranty plan, which included, among other things, electrical and gas modifications and haul away and thermostat costs.

3

Benham wrote First American asking it to explain the non-covered costs, and First American responded that her home protection plan excluded the costs for alterations or modifications necessary to install different equipment or to correct prior improper installations. First American advised that she could receive $618.02 in lieu of the furnace replacement. Benham disputed these non-covered costs. On October 26, 2010, Benham sent an e-mail to First American telling it to send a copy of all future correspondence to her attorney, Robert F. Campbell.

On November 9, 2010, Benham received an estimate from SA Heating to install a 95 percent efficiency brand furnace for the price of $2,750. Benham notified First American of this estimate. Benham received a proposal from Atlas to replace her furnace with a Goodman 92.1 percent efficiency furnace for $4,795.00. According to Benham, the market rate cost to replace her furnace was between $3,000 and $3,200.

On November 15, 2010, First American sent a check for $618.02 to Benham. Above the signature line on the back of the check, it stated: "Endorsement of this check constitutes full release of First American Home Buyers Protection from making future repairs or replacement to your furnace." Benham did not cash this check.

Campbell wrote a letter dated February 3, 2011, on behalf of Benham to First American. The letter stated that Benham had obtained an estimate from a licensed heating and air-conditioning company indicating that the reasonable cost to install a comparable replacement furnace was $4,976.00. Deducting the uncovered costs of $1,200.00 from this estimate, First American, according to Campbell, owed Benham a minimum of an additional $3,157.98. On February 15, 2011, First American refused to pay the additional money requested. It stated that it "consider[ed] this claim closed."

On October 18, 2011, Benham sued for breach of contract and breach of the covenant of good faith and fear dealing. Benham requested compensatory and punitive damages.

On October 31, 2012, counsel for First American sent a check to Benham in the amount of $6,000.000 to settle the case ($4,976 for the alleged replacement cost plus $1,023.83 in interest). The letter stated: "To be clear, First American pays this amount

4

to fully compensate Plaintiff's claim for benefits under her First American [c]ontract, including interest, at the legal rate, solely in order to minimize the expense of this case, which has been disproportionate to the actual amount at issue. First American does ***not*** admit any claims or allegations. First American does not make this payment conditional upon release of Plaintiff's alleged claims for attorneys' fees, damages for 'humiliation, mental anguish and emotional distress,' punitive damages or costs. By acknowledging Plaintiff's claims, First American does not admit them." (Bold in original.) This sum, according to Benham, went into her attorney's trust account after she endorsed the check; her attorney disbursed money to her from this trust account.

On June 4, 2013, Benham filed a first amended complaint for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the UCL (Bus. & Prof. Code, § 17200 et seq.).[2] She requested punitive damages and injunctive relief under the UCL. Benham alleged that First American is an insurer and that it, among other things, "wrongly delayed payment of benefits of the" home warranty "policy."

First American moved for summary judgment arguing that it was not an insurer and the home warranty plan is not an insurance contract. On December 6, 2013, the trial court issued its order granting First American's motion for summary judgment. The court concluded that California Code of Regulations, title 10, section 2695.9,[3] which Benham contended First American violated, did not apply to home protection companies or to home protection plans. It further ruled that First American did not breach its contract and Benham had no damages. The court denied Benham's breach of the implied warranty of good faith and fair dealing claim because of its determination that home protection plans are not insurance contracts and its conclusion that Benham had an

---

[2] The caption in both Benham's original complaint and her first amended complaint includes a claim for negligence, but neither pleading sets forth a separate cause of action for negligence.

[3] All references and citations to Regulations refer to sections in title 10 of the California Code of Regulations.

adequate contract remedy. The court found that Benham did not have standing to bring the UCL claim as she did not suffer any economic injury.

On February 4, 2014, the trial court filed its notice of entry of judgment, dismissing Benham's lawsuit against First American. Benham filed a timely notice of appeal.

## DISCUSSION

### I. *Summary Judgment Rules and Standard of Review*

A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) A defendant moving for summary judgment has the initial burden of showing either that one or more elements of the cause of action cannot be established or that there is a complete defense. (*Id.,* § 437c, subd. (p)(2).) If that initial burden is met, the burden shifts to the plaintiff to show the existence of a triable issue of fact with respect to that cause of action or defense. (*Ibid.*; see *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-853.)

On appeal, " 'we take the facts from the record that was before the trial court when it ruled on that motion. [Citation.] " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " [Citation.] We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. [Citation.]' [Citation.]" (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 716-717 (*Wilson*).)

### II. *Home Protection or Warranty Plans and the Insurance Code*

Benham contends that home protection or warranty plans are insurance. First American acknowledges that home protection plans and companies issuing them are regulated by the Department of Insurance (see, e.g., Ins. Code, §§ 12744 [must have a

6

license issued by Department of Insurance]; 12752),[4] but maintains they do not constitute insurance contracts. Whether these home protection plans are insurance is significant because, although all contracts have a covenant of good faith and fair dealing, tort remedies are generally not available for breaches of noninsurance contracts. (*Foley v. Interactive Data Corp.* (1988) 47 Cal.3d 654, 669-700; *Rattan v. United Services Automobile Assn.* (2000) 84 Cal.App.4th 715, 722.)

The Insurance Code defines a home protection plan as "a contract or agreement whereby a person, other than a builder, seller, or lessor of the home which is the subject of the contract, undertakes for a specified period of time, for a predetermined fee, to repair or replace all or any part of any component, system or appliance of a home necessitated by wear and tear, deterioration or inherent defect, arising during the effective period of the contract . . . . [¶] Such contract shall provide for a system of service for effectuating such repair or replacement and shall not include protection against consequential damage from the failure of any component, system or appliance." (§ 12740, subd. (a).) First American is a " '[h]ome protection company' " under section 12740, subdivision (b), which defines such a company as "any person licensed pursuant to this part which issues home protection contracts." (§ 12740, subd. (b).)

The question whether a home protection or warranty plan is an insurance contract has not been addressed by any published California state court opinion. A federal district court has stated in dicta that they are "analogous" to insurance contracts. (*Campion v. Old Republic Home Protection Co., Inc.* (S.D.Cal. 2012) 861 F.Supp.2d 1139, 1145 (*Campion*).) The issue before the *Campion* court was whether a plaintiff could bring a claim against the seller of home warranty plans under California's Consumer Legal Remedies Act (CLRA), which prohibits unfair or deceptive acts that "result[] in the sale or lease of goods or services to any consumer . . . ." (Civ. Code, § 1770.) The court concluded that home warranty plans are not service contracts and thus are not covered by the CLRA. (*Campion,* at p. 1146.)

---

[4] All further unspecified code sections refer to the Insurance Code.

7

In concluding that home protection plans are like insurance contracts, the *Campion* court cited section 22, which defines "[i]nsurance" as "a contract whereby one undertakes to indemnify another against loss, damage, or liability arising from a contingent or unknown event." (§ 22; see also § 23 [defining an insurer as "[t]he person who undertakes to indemnify another by insurance"].) The *Campion* court concluded that "home warranty plans provide for a transfer of risk . . . and the relationship between [the company offering the home protection plan] and its plan holders and their respective obligations are consistent with the concept of 'insurance,' as it is defined in the Insurance Code." (*Campion, supra,* 861 F.Supp.2d at p. 1146, fn. omitted.)

Our Supreme Court has interpreted section 22 as requiring two elements: "(1) a risk of loss to which one party is subject and a shifting of that risk to another party; and (2) distribution of risk among similarly situated persons." (*Metropolitan Life Ins. Co. v. State Bd. of Equalization* (1982) 32 Cal.3d 649, 654.) Although the *Campion* court ended its analysis with the conclusion that home protection plans resemble insurance contracts because they shift the risk to another party, the California Supreme Court has clarified that a contract can satisfy the two elements in section 22 and still not be an insurance contract. " '[T]he mere fact that a contract contains these two elements [shifting and distribution of risk of loss] does not necessarily mean that the agreement constitutes an insurance contract for purposes of statutory regulation.' [Citation.] Rather than simply look to whether the contract involves an assumption of a risk, we will instead ask ' "whether that [assumption of risk] or something else to which it is related in the particular plan is its principal object and purpose." ' [Citations.]" (*Title Ins. Co. v. State Bd. of Equalization* (1992) 4 Cal.4th 715, 726.)

First American claims that home protection plans are not insurance because they are not indemnity contracts. It notes that section 22 provides that insurance is "a contract whereby one undertakes to indemnify another against loss," and then cites Civil Code section 2772 as defining "[i]ndemnity [as] a contract by which one engages to save another from a *legal consequence* of the conduct of one of the parties, or of some other person." (Italics added.) It concludes that a home protection plan is not an insurance

8

contract because, as made clear in section 12740, subdivision (a), home protection policies do not protect a person from the legal consequences of a party's conduct.

First American's reliance on Civil Code section 2772 is misplaced. Civil Code section 2772 applies to contracts of indemnity, and courts have consistently considered indemnity agreements (Civ. Code, § 2772 et seq.) to be outside the insurance context. (See, e.g., *California Physicians' Service v. Garrison* (1946) 28 Cal.2d 790, 803-804; *Crawford v. Weather Shield Mfg. Inc.* (2008) 44 Cal.4th 541, 567, fn. 15.) As already noted, the California Supreme Court does not use Civil Code section 2772 to interpret section 22 in the Insurance Code. (See, e.g., *Metropolitan Life Ins. Co. v. State Bd. of Equalization, supra,* 32 Cal.3d at p. 654.)

The statutes are not clear what is intended when they use the terms insured, insurer, or insurance. Section 12743, subdivision (j) defines a home protection company as an insurer, the contract holder as the insured, and states that a " '[p]olicy' or 'insurance' shall mean home protection contract." Regulation 2695.2, subdivision (i), defines " '[i]nsurer' [to] mean[] a person licensed to issue or that issues an insurance policy . . . . The term 'insurer' for purposes of these regulations *includes non-admitted insurers*, . . . *home protection companies* as defined under California Insurance Code Section 12740, and any other entity subject to California Insurance Code Section 790.03[, subdivision] (h)." (Italics added.) Under subdivision (j), it provides that " '[i]nsurance policy' means the written instrument in which any certificate of group insurance, contract of insurance, or non-profit hospital service plan is set forth. . . . *For the purposes of these regulations the term insurance policy* or policy *includes a home protection contract . . . .*" (Italics added.) Thus this Regulation indicates that a provision may use the term "insurance" to include non-insurance contracts.

The Insurance Code does not specifically characterize home protection plans as insurance; nor does it definitively exclude them from being insurance. A home protection contract is not identified as a class of insurance under section 100, although this statute includes the catchall classification of "[m]iscellaneous." However, home protection is identified as a class of insurance in Part 7 of Division 2 of the Insurance

9

Code.  (§ 12740 through 12745; see, e.g., § 12742 ["Home protection contracts and home protection companies, and all matters incident to or concerned with such contracts and companies, shall be exclusively subject to and regulated by the provisions of this part and, except as provided in Section 12743, shall not be governed by any other provision of this code"].)  Section 12743 subjects home protection plans to specific provisions of the Insurance Code, including section 790 et seq., relating to unfair practices.  (§ 12743, subd. (d)(7).)

Further complicating the issue, the Insurance Code does not exempt from its provisions in Part 7 of Division 2 home protection plans, while it does exempt from these provisions service contracts by builders and "[a]ny service contract, guarantee, or warranty intending to guarantee or warrant the repairs or service of a home appliance, system or component, provided such service contract, guarantee, or warranty is issued by a person who has sold, serviced, repaired or provided replacement of that appliance, system or component at the time of, or prior to issuance of the contract, guarantee, or warranty; and, provided, further, that the person issuing the service contract, guarantee, or warranty does not engage in the business of a home protection company." (§ 12741, subds. (a) & (b).)  This indicates an intent to treat home protection plans differently than other warranty contracts.

No California statute or judicial decision has created a bright line test to determine whether a home protection policy or plan is insurance and we cannot discern any clear legislative intent from the abovementioned statutes.[5]  We, however, decline to address

_____

[5] First American requested that we take judicial notice under Evidence Code section 452, subdivisions (b) and (c), and section 453, of a consumer information guide entitled, Residential Insurance:  Homeowners and Renters (rev. May 2011), published by the California Department of Insurance.  (<http://www.insurance.ca.gov/01-consumers/ 105-type/95-guides/03-res/res-ins-guide.cfm#homewarranties> [as of Aug. 31, 2015].)  Under the heading of "Home Warranties," this guideline states in relevant part: "Traditionally, home warranties have protected homeowners from repair costs that aren't covered by homeowners insurance. . . .  [¶] . . . [¶]  It is important to note that a home warranty is not an insurance policy.  However, for the protection of consumers, these companies are regulated by the [California Department of Insurance] and must be

10

this issue because, for the reasons discussed below, Benham's claims fail no matter whether First American's home warranty plan is insurance or simply a contract regulated by the Department of Insurance.

### III. *Breach of Contract*

The undisputed evidence established that First American asked Benham whether she wished to have her furnace replaced by SA Heating or receive payment in lieu of replacement. Benham refused to have SA Heating replace the furnace and First American paid her $618.02. First American submitted undisputed evidence that it had placed a purchase work order with Goodman Distribution for a replacement furnace for the sum of $472.00 plus $46.02 in tax and that SA Heating had agreed to replace the furnace for $155. Thus, the payment of $618.92 to Benham satisfied the provision in First American's home warranty plan that stated First American could make a "payment of cash in lieu of repair or replacement" and that the payment would be based on its "negotiated rates with its suppliers, which [might] be less than retail."

Benham does not allege that First American breached any provision in First American's warranty plan, but insists that this plan did not comply with Regulation 2695.9. She argues that under this Regulation, First American had to inform her that she

licensed by our Department. These warranties, sometimes described as service contracts, typically last one year, and cover the repair or replacement of major home systems and appliances that break down due to normal wear and tear. Home warranties don't overlap or replace the homeowners insurance policy. For example, if your hot water heater burst and destroyed a wall in your home, the warranty would repair the water heater and your insurance company would pay to fix the wall and any floor damage. . . ."

This guide is, at best, an informal interpretation of home protection plans. Although this guide has limited, if any, relevance, we take judicial notice of it under Evidence Code section 452, subdivision (h) (judicial notice may be taken of "[f]acts and propositions that are not reasonably subject to dispute and are capable of immediate and accurate determination by resort to sources of reasonably indisputable accuracy").

Benham cites the Historical Statutory Notes to Insurance Code section 12740, which cited an Attorney General opinion issued on May 3, 1978, stating that companies offering home protection contracts were transacting insurance, and the lack of any regulations had created uncertainty for the beneficiaries of the contracts and for those engaged in or related to this industry.

11

had a right to select her own contractor, could not require her to have the furnace repaired by a specific individual or entity, and could not limit her benefits to less than local retail rates. She maintains that the provisions in First American's warranty plan that provided for payment based on First American's negotiated rates, which could be less than retail, were illegal, unenforceable, and severable.

As the trial court found, Regulations 2695.1 through 2695.7 "articulates generally applicable regulations and applies to home protection companies." Regulations 2695.8 through 2695.11 provide additional regulations governing particular classes of insurance, and the plain language of Regulation 2695.9 clarifies that it applies only "to first party residential and commercial property insurance policies."

Section 10087, subdivision (a) provides: "As used in this chapter, 'policy of residential property insurance' shall mean a policy insuring individually owned residential structures . . . . A policy that does not include any of the perils insured against in a standard fire policy shall not be included in the definition of 'policy of residential property insurance.'" Section 2071 delineates the terms of a standard fire policy while section 12762 specifies the information that must be included in a home protection plan.

Benham argues that section 10087's definition is limited to "this chapter," which is earthquake insurance. She maintains it has no relevance to the definition of residential property insurance as it is used in the Regulations.

The basic principles of statutory construction require that we "ascertain the intent of the Legislature so as to effectuate the purpose of the law." (*Dyna-Med, Inc. v. Fair Employment & Housing Com.* (1987) 43 Cal.3d 1379, 1386, superseded by statute on another issue.) In doing so, we turn "first to the words of the statute themselves, giving to the language its usual, ordinary import and according significance, if possible, to every word, phrase and sentence," avoiding a construction that would render some words surplusage. (*Id.* at pp. 1386-1387.) "The words of the statute must be construed in context, keeping in mind the statutory purpose, and statutes or statutory sections relating to the same subject must be harmonized, both internally and with each other, to the extent

12

possible. [Citations.] Where uncertainty exists consideration should be given to the consequences that will flow from a particular interpretation. [Citation.]" (*Id.* at p. 1387.)

Section 10087 requires insurers to offer coverage for loss or damage from an earthquake when issuing or delivering residential property insurance, and it provides a definition of what a residential property insurance policy is. Statutes in other chapters in the Insurance Code have used this definition of residential property. (See §§ 396, subd. (f); 790.03l; 1763.1; 1625.5; 10104, subd. (a).) Thus, the definition for residential property provided in section 10087 has been used in other provisions, unrelated to earthquake insurance. Additionally, the nomenclature "home protection companies" or "home protection plans," is used elsewhere in the Regulations. (See, e.g., Regs. 2570.04; 2570.06; 2570.02; 2570.03; 2570.01; 2570.08; 2570.09; 2695.1, subd. (d), 2695.2, subds. (i) & (j); 2278.50; 2696.22, subd. (f); 2698.30, subd. (j)(7).) No regulation or statute defines residential property insurance to include home protection plans. Applying the principles of statutory construction and harmonizing the provisions in the Insurance Code with the relevant regulations, it is clear that Regulation 2695.9 has no application to a home protection plan.

Furthermore, even if Regulation 2695.9 applies or First American failed to comply with some other regulation, Benham cannot prevail on her claim for breach of contract. It is axiomatic that a plaintiff alleging a cause of action for breach of contract must allege that he or she suffered damages caused by the defendant's wrongful conduct. (See, e.g., *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 821 [elements of breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff"].) Here, First American paid Benham $6,000, and it is undisputed that this sum equaled the amount Benham spent to replace her furnace plus interest.

Benham does not contend that First American owes her additional money under the contract but claims she suffered emotional distress due to Benham's delay in paying her the money owed. When asked at her deposition how she was damaged, Benham responded: "I have been damaged in terms of lost time. I have been angry, frustrated,

13

chagrinned, disappointed, and spent a considerable amount of time . . . arguing over something that could have been settled for $3,000." She also was upset that First American characterized her as being engaged in a "shakedown." She stated that she had not been reimbursed for the time and energy she was forced to devote to try to get reimbursed for the cost of the heater. She admitted that she had not sought any medical, psychological or psychiatric counseling, or treatment from any other healthcare professional in connection with First American's handling of her claim. She also had not spent any money for medications or prescriptions as a result of First American's treatment of her claim.

Benham cites various cases to support her claim that emotional damages may be sought in a breach of contract claim where " 'the terms of a contract relate to matters which concern directly the comfort, happiness, or personal welfare of one of the parties, or the subject matter of which is such as directly to affect or move the affection, self-esteem, or tender feelings of that party.' " (*Wynn v. Monterey Club* (1980) 111 Cal.App.3d 789, 800; see also *State Farm Mutual Auto. Ins. Co. v. Allstate Ins. Co.* (1970) 9 Cal.App.3d 508, 527-528 [upheld emotional distress damages from a breach of the duty to defend]; *Frazier v. Metropolitan Life Ins. Co.* (1985) 169 Cal.App.3d 90, 102-103 [plaintiff awarded damages for emotional distress against a life insurance company that refused to pay to plaintiff an accidental death benefit for the death of her husband].) This is a correct statement of the law, but she does not explain how a home protection plan falls into this category.

Damages for mental suffering and emotional distress are generally not recoverable in an action for breach of contract except in those cases where emotional concerns are the essence of the contract. (*Erlich v. Menezes* (1999) 21 Cal.4th 543, 559 ["Cases permitting recovery for emotional distress typically involve mental anguish stemming from more personal undertakings the traumatic results of which were unavoidable"].) The *Ehrlich* court reversed an award of damages for emotional distress for negligent construction of the plaintiffs' house. (*Ibid.*) The evidence showed defects in the roof, exterior stucco, windows and waterproofing, and serious errors in the construction of the

14

home's structural components, and the homeowners testified that they suffered emotional distress as a result of the defective condition of the house and the invasive and unsuccessful repair attempts. (*Id.* at pp. 548-549.)

Home protection plans that involve the repair or replacement of one system or appliance in the home have much less impact on the comfort, happiness, or personal welfare on the beneficiary of the plan than contracts involving construction of an entire home; home protection plans do not fall within the category of contracts that directly affect the happiness, comfort, or personal welfare of the insured. Moreover, in the absence of physical injury, courts have never allowed recovery of damages for emotional distress arising solely from property damage or economic injury to the plaintiff. (*Erlich v. Menezes, supra,* 21 Cal.4th at pp. 557-558; see also *Waters v. United Services Auto. Assn.* (1996) 41 Cal.App.4th 1063, 1070; *Maxwell v. Fire Insurance Exchange* (1998) 60 Cal.App.4th 1446, 1450-1451.)

It is not disputed that Benham received the sum she claimed was due under the First American home warranty plan. She never alleged or provided any evidence that she suffered any physical injury as a result of the delay in receiving payment. Benham failed to submit evidence of damages and the trial court properly granted summary judgment against her breach of contract claim.

## IV. *Breach of the Covenant of Good Faith and Fair Dealing*

California law recognizes in every contract an implied covenant of good faith and fair dealing. (*Wilson, supra*, 42 Cal.4th at p. 720.) In the insurance context, the implied covenant requires the insurer to refrain from injuring its insured's right to receive the benefits of the insurance agreement. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 818.) Thus, even if we treat First American's home warranty plan as an insurance contract, as Benham urges, she still cannot prevail. As already noted, she rejected First American's offer to have SA Heating replace her furnace and she received the cash due her in lieu of replacement as set forth in First American's home warranty plan.

15

Moreover, even if we were to accept Benham's argument that she was entitled to the sum it cost her to have Atlas replace the furnace, she still could not prevail on this tort claim. First American did pay Benham this additional amount, and Benham must establish that its delay in paying her was unreasonable under all the circumstances. "[B]efore an insurer can be found to have acted tortiously (i.e., in bad faith), for its delay or denial in the payment of policy benefits, it must be shown that the insurer acted *unreasonably* or *without proper cause*. [Citations.] However, where there is a *genuine issue* as to the insurer's liability under the policy for the claim asserted by the insured, there can be no bad faith liability imposed on the insurer for advancing its side of that dispute. [Citations.]" (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347, disapproved on other grounds in *Wilson, supra,* 42 Cal.4th at p. 724, fn. 7.) Whether a delay in paying an insurance claim is an "unreasonable" delay is a question of fact, but it becomes a question of law where the only one inference can be drawn from the evidence. (*Paulfrey v. Blue Chip Stamps* (1983) 150 Cal.App.3d 187, 194-196.)

Here, as a matter of law, we conclude that it was reasonable for First American to rely on the clear language in its home warranty plan.[6] Benham has not alleged or submitted evidence to indicate that First American's warranty plan did not comply with section 12762, which specifies the information that must be included in a home protection plan. There is no evidence that First American did not fulfill its duty to act fairly and in good faith in discharging its contractual responsibility to Benham; it did not withhold any payments due under its plan. In the absence of any judicial decision or

---

[6] Benham argues that she presented evidence that First American was involved in a scheme with a contractor to charge high "non-covered costs" in exchange for an extremely low installation charge of $155. Steve Wheeler, a licensed heating contractor, provided a declaration estimating the cost to replace the furnace at Benham's home as being significantly higher than $155. This declaration does not show that First American was involved in a scheme to charge high "non-covered costs"; nor does it show that it was unreasonable for First American to perform pursuant to the terms of the contract. Furthermore, Benham did not allege in her first amended complaint that she was injured because the "non-covered costs" were excessive.

16

statute making it clear that provisions in First American's warranty plan were invalid, any delay in paying Benham more than it was obligated to pay under its plan was reasonable as a matter of law.

## V. *UCL Violation*

In Benham's third cause of action, she requested injunctive relief and alleged that First American violated the UCL (Bus. & Prof. Code, § 17200) by violating various Regulations (e.g., Reg. 2695.9).

The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as "any unlawful, unfair or fraudulent business act or practice." (Bus. & Prof. Code, § 17200.) "In 2004, the electorate substantially revised the UCL's standing requirement; where once private suits could be brought by 'any person acting for the interests of itself, its members or the general public' [citation], now private standing is limited to any 'person who has suffered injury in fact and has lost money or property' as a result of unfair competition [citations]. The intent of this change was to confine standing to those actually injured by a defendant's business practices and to curtail the prior practice of filing suits on behalf of ' "clients who have not used the defendant's product or service, viewed the defendant's advertising, or had any other business dealing with the defendant . . . ." ' [Citations]." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 788.) A plaintiff must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, i.e., *economic injury,* and (2) show that the economic injury was the result of, i.e., *caused by,* the unfair business practice . . . ." (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 322.)

Benham argues that her acceptance of $6,000, which First American gave her after she filed this lawsuit, did not prevent her from filing a UCL claim. She contends that she "is not deprived of standing because [First American] mitigated Benham's replaced cost damages" and she cites *Clayworth v. Pfizer, Inc., supra,* 49 Cal.4th 758.

In *Clayworth v. Pfizer, Inc., supra,* 49 Cal.4th 758, the court concluded that retail pharmacies had standing to assert UCL claims against pharmaceutical companies that had allegedly engaged in price fixing even though the retail pharmacies were able to pass on

17

any overcharges to their customers. (*Id.* at p. 788.) The court rejected the pharmaceutical companies' argument the pharmacies ultimately "suffered no compensable loss because they were able to mitigate fully any injury by passing on the overcharges," explaining "[t]he doctrine of mitigation, where it applies, is a limitation on liability for damages, not a basis for extinguishing standing. [Citation.] This is so because mitigation, while it might diminish a party's recovery, does not diminish the party's interest in proving it is entitled to recovery." (*Id.* at p. 789.)

Benham's argument makes little sense. First American had no duty to mitigate; the duty to mitigate or the rule of mitigation applies to the injured party, not to the party committing the legal wrong. The present case is not a situation where Benham had no or reduced damages because she was able to pass off her costs to another party or was otherwise able to mitigate them.

First American did delay paying Benham the $6,000, which was the retail cost to replace the furnace. However, Benham submitted no evidence that this delay caused her any economic injury.

The only other damages Benham claims she suffered were emotional distress damages. Emotional distress damages do not satisfy the requirement that she suffered a loss of money or property.

The trial court correctly found that Benham was not injured and that she had no standing to claim a violation of the UCL.

## DISPOSITION

The judgment is affirmed. Benham is to pay the costs of appeal

18

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Miller, J.