[No. S141790. Nov. 29, 2007.]

REAGAN WILSON, Plaintiff and Appellant, v.
21ST CENTURY INSURANCE COMPANY, Defendant and Respondent.

■■■■■■■■■■

■■■■■■■■■■

---

**COUNSEL**

Hall & Bailey, Donald R. Hall; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiff and Appellant.

Horvitz & Levy, Barry R. Levy, Bradley S. Pauley; Lewis Brisbois Bisgaard & Smith and N. David Lyons for Defendant and Respondent.

Robie & Matthai, James R. Robie, Kyle Kveton and Steven S. Fleischman for State Farm Mutual Automobile Insurance Company, United Services Automobile Association, Infinity Insurance Company, Farmers Insurance Exchange, Fire Insurance Exchange, Truck Insurance Exchange and Mid-Century Insurance Company as Amici Curiae on behalf of Defendant and Respondent.

---

**OPINION**

**WERDEGAR, J.**—In this first party insurance bad faith action, the question on review is whether summary judgment was properly granted for the insurer. Eight months after plaintiff Reagan Wilson was injured in an automobile accident by a drunk driver, her insurer, defendant 21st Century Insurance Company (21st Century), rejected her demand for payment of the $100,000 policy limit on her underinsured motorist coverage. Although Wilson's treating physician had opined that the 21-year-old woman had "degenerative disk changes as a result of occult disk injury at the levels in her neck from her high speed motor vehicle accident," and that these spinal changes were atypical for her age and "almost certainly" caused by the automobile accident, 21st Century rejected the claim on the asserted ground that she had suffered only soft tissue injuries in the collision and had "preexisting" degenerative disk disease. Because, based on the undisputed facts in the summary judgment record, a jury could reasonably find 21st Century reached this medical conclusion without a good faith investigation of the claim and without a reasonable basis for genuine dispute, we agree with the Court of Appeal that summary judgment on plaintiff's bad faith cause of action was improper.

### FACTUAL AND PROCEDURAL BACKGROUND

"Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the

trial court when it ruled on that motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034–1035 [6 Cal.Rptr.3d 441, 79 P.3d 556].) ' "We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained." ' (*Id.* at p. 1035.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)" (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037 [32 Cal.Rptr.3d 436, 116 P.3d 1123].)

The summary judgment record reflects the following facts:

On November 22, 2000, an intoxicated driver made a left turn directly in front of the vehicle Wilson was driving, resulting in a collision. She was treated at an emergency room in Monterey for bruises and a wrist injury; she also complained of pain in her chest and upon moving her neck. Several days later she told Dr. Douglas Jackson in Santa Barbara, where she was attending college, that she was still feeling pain in her neck and left shoulder, as well as in her left wrist. A "limited" cervical spine X-ray ordered by Dr. Jackson was evaluated as "normal," with "[m]ild straightening of lordosis" but "no fracture, degenerative change or soft tissue swelling."[1] Dr. Jackson prescribed physical therapy for the neck pain.

On January 29, 2001, Wilson was examined by Edward Southern, an orthopedist in Long Beach. She reported continued neck, back and arm pain. Not having the prior film before him, Dr. Southern ordered additional cervical spine X-rays, which he found showed "reversal of the cervical lordosis with calcification of the anterior disk spaces at C4-5 and C5-6 with narrowing of the disk space more so at C5-6." Dr. Southern ordered a magnetic resonance imaging scan (MRI) to determine whether the "obviously degenerative motion segment within her cervical spine" was causing the arm pain. If the MRI was "markedly abnormal," Dr. Southern noted, Wilson might have to delay her planned departure for a period of study in Australia.

Dr. Southern's clinical impression was as follows: "A young woman involved in a high speed motor vehicle accident with changes now in the cervical spine which are atypical for a patient of her age and are almost certainly due to the history of trauma. She probably has degenerative disk

---

[1] Cervical (neck) lordosis is "the normal, anteriorly convex curvature of the cervical segment of the vertebral column." (Stedman's Medical Dict. (27th ed. 2000) p. 1032.)

changes as a result of occult disk injury at the levels in the neck from her high speed motor vehicle accident."[2]

The MRI showed "mild desiccated discs at C2-3, C3-4, C4-5, C5-6 and C6-7," "mild dextroscoliosis" and "2mm or less posterior disc bulges at C4-5, C5-6 and C6-7," while "the central canal and neural foramina are patent at these levels."[3] "No significant disc pathology" was found at other levels.

In February 2001, Donald Hall, Wilson's attorney, told Paul Le, 21st Century's claims examiner, that his client wanted to make a claim on her underinsured motorist (UIM) coverage. In April, after Wilson reached a settlement with the other driver for his $15,000 liability coverage, Le asked Hall to send 21st Century a demand package so he could evaluate the UIM claim.

Hall sent Le a demand letter and documentation on June 28, 2001. The medical reports described above were attached. Hall told Le that after the accident Wilson had made a long-planned trip to Europe, which was "ruined" by her injuries. At the time of the demand letter, Hall wrote, she was studying in Australia but was still experiencing pain "on a regular basis." He quoted Dr. Southern's opinion that Wilson had suffered degenerative disk changes as a result of the automobile accident. The general damages resulting from such an injury at Wilson's young age, Hall asserted, exceeded the $100,000 UIM policy limits. He requested that 21st Century pay Wilson $85,000, the UIM policy benefit remaining after Wilson's recovery of $15,000 from the other driver.

Le and Hall discussed the claim by telephone on July 6, 2001. According to Le's notes of the conversation, he asked Hall if there was any additional medical documentation for the claim. Hall said there was not, but that Dr. Southern's report indicated disk changes that would affect Wilson later in life. Le then asked, "Why is she in Australia if [her] inj[ury] [is] so severe?" and observed that Wilson "is young and may not experience any pain in future from deg[enerative] disk." Le also noted his own opinion that the "MRI does not show bulge touching the nerves."

By a memorandum dated July 9, 2001, Le sought and obtained the approval of his superior, Jay Boomer, to reject Wilson's UIM claim. In the

---

[2] "Occult" is used here in the sense of "[h]idden; concealed; not manifest." (Stedman's Medical Dict., *supra*, at p. 1251.)

[3] Scoliosis is an "[a]bnormal lateral and rotational curvature of the vertebral column." Dextroscoliosis denotes a curvature to the right. (Stedman's Medical Dict., *supra*, at pp. 488, 1606.) A foramen (plural: foramina) is "[a]n aperture or perforation through a bone or a membranous structure." (*Id.* at p. 698.)

memo, Le wrote that Wilson "has a pre-existing condition pertaining to scolosis [sic], MRI shows no encroachment of a neural structure, it is unlikely that the 2mm bulge was produced by this accident. Presently, the [insured] is on vacation in Australia and is not expected to return until November, this discounts her attorney's allegation that the pain & suffering and injuries are severe." Le recommended offering Wilson the $5,000 limit of her medical payments coverage; with the $15,000 received from the negligent other driver, Le asserted, this would fully compensate her. Boomer approved this course, noting his view that Wilson's injuries were "really just ST [soft tissue]."

Before making the recommendation to reject Wilson's UIM claim, Le did not attempt to contact Dr. Southern and did not speak with any other medical practitioner about the claim.

21st Century rejected Wilson's UIM claim by a letter from Le to Hall dated July 17, 2001. After noting that "the X-rays" were "normal" and paraphrasing the conclusions of the January 2001 MRI report, Le stated: "Based on the above, we believe your client sustain [sic] soft tissue injury superimposed by a preexisting degenerative disc disease. Therefore, we believe that your client has been fully compensated for her injuries by the payment of the $15,000 policy limits from North Pointe Insurance plus our Medical Payment limits of $5,000."

Soon after receiving 21st Century's rejection, Wilson initiated arbitration of the claim. In late 2001 and 2002, Wilson saw Dr. Southern and other physicians for her continuing neck pain. After a diskogram was performed in June 2002, one orthopedic surgeon recommended spinal fusion surgery. Wilson did not go through with the surgery at that time. In August 2002, she saw a neurosurgeon who recommended pain management instead of surgery; Wilson pursued that course, which to some extent alleviated the pain, through the remainder of 2002.

In 2002, after learning of the surgery recommendation (through deposing Wilson in preparation for arbitration), 21st Century retained independent physicians to examine Wilson and review her medical records. Stephen Nagelberg, the retained orthopedic surgeon, saw evidence on the diskogram of "bilateral leakage of C4-5, and a right-sided annular tear with leakage of C5-6." In June 2003, Dr. Nagelberg reported to 21st Century that Wilson's neck pain was caused by these disk injuries, which resulted from the November 2000 automobile accident. He recommended surgery. Allan Chan, the claims examiner now handling the case, promptly prepared a revised evaluation of Wilson's claim and requested and received authorization to pay Wilson the $85,000 remainder of her UIM policy limit. 21st Century paid Wilson the $85,000 on July 23, 2003.

Wilson sued 21st Century, alleging in her second cause of action that 21st Century's denial of benefits in July 2001 and the resulting two-year delay until the UIM claim was paid in July 2003 breached the covenant of good faith and fair dealing and caused her damages in the form of lost interest on the policy benefits, attorney fees and costs incurred to recover payment, and general damages including emotional distress. 21st Century moved for summary judgment or summary adjudication of this cause of action on the ground that its 2001 decision to refuse the UIM demand was, in light of the facts known to the company at the time, reasonable as a matter of law. The superior court granted the motion, finding no triable issue of fact as to whether 21st Century had acted in bad faith.

The Court of Appeal reversed, holding triable issues of fact existed as to whether 21st Century had thoroughly investigated and objectively evaluated Wilson's UIM claim before denying it. We granted 21st Century's petition for review.

## Discussion

"A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c); see also *id.*, § 437c, subd. (f) [summary adjudication of issues].) The moving party bears the burden of showing the court that the plaintiff 'has not established, and cannot reasonably expect to establish,' " the elements of his or her cause of action. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460 [30 Cal.Rptr.3d 797, 115 P.3d 77].)

■ The law implies in every contract, including insurance policies, a covenant of good faith and fair dealing. "The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests. When the insurer unreasonably and in bad faith withholds payment of the claim of its insured, it is subject to liability in tort." (*Frommoethelydo v. Fire Ins. Exchange* (1986) 42 Cal.3d 208, 214–215 [228 Cal.Rptr. 160, 721 P.2d 41].)

### I.  *Lack of Thorough Investigation and Fair Evaluation*

■ While an insurance company has no obligation under the implied covenant of good faith and fair dealing to pay every claim its insured makes, the insurer cannot deny the claim "without fully investigating the grounds for its denial." (*Frommoethelydo v. Fire Ins. Exchange, supra*, 42 Cal.3d at

p. 215.) To protect its insured's contractual interest in security and peace of mind, "it is essential that an insurer fully inquire into possible bases that might support the insured's claim" before denying it. (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819 [169 Cal.Rptr. 691, 620 P.2d 141].) By the same token, denial of a claim on a basis unfounded in the facts known to the insurer, or contradicted by those facts, may be deemed unreasonable. "A trier of fact may find that an insurer acted unreasonably if the insurer ignores evidence available to it which supports the claim. The insurer may not just focus on those facts which justify denial of the claim." (*Mariscal v. Old Republic Life Ins. Co.* (1996) 42 Cal.App.4th 1617, 1623 [50 Cal.Rptr.2d 224]; see also *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 880 [93 Cal.Rptr.2d 364].)

Applying these principles to the facts in the summary judgment record, we agree with the Court of Appeal that plaintiff has demonstrated a triable issue of fact as to whether 21st Century's decision to deny her UIM claim in July 2001 was made unreasonably and in bad faith.[4] Wilson complained of neck pain after the accident and in subsequent weeks and months. On examination of the patient and her X-ray, Dr. Southern, an orthopedist, concluded a segment of her cervical spine was "obviously degenerative," that such a change was unusual at her age, and was probably due to her recent automobile accident. The MRI he ordered confirmed bulging disks in the vertebrae of her neck. Wilson was continuing to feel neck pain in June 2001 when, through her attorney, she made the UIM claim.

Despite his receipt of this information, 21st Century's claims examiner asserted in his internal denial memo that it was "unlikely" the disk bulges were caused by the accident and that because Wilson was "on vacation" in Australia her claims of severe pain should be "discount[ed]." Having received approval to deny the claim, he then did so on the ground that Wilson's pain was due only to "soft tissue injury superimposed by a preexisting degenerative disc disease."

■ Unfortunately for 21st Century's summary judgment position, a jury could reasonably find that nothing in the material the claims examiner had received justified these conclusions. 21st Century directs us to no medical report or opinion on the basis of which the claims examiner could reasonably have ignored or disbelieved Dr. Southern's conclusion that the changes in Wilson's cervical spine were probably caused by her recent trauma; as far as the record reveals, the claims examiner had no basis for his contrary

---

[4] The parties agree Wilson's bad faith claim is based on 21st Century's actions leading to the July 2001 denial. Wilson abjures reliance on any conduct after that point, while 21st Century argues only that evidence of its subsequent actions was relevant to show its good faith willingness to reconsider the denial.

conclusion that such a causative link was "unlikely." Nor is there any apparent medical basis for the claims examiner's assertion that Wilson had "preexisting degenerative disc disease." No such diagnosis appears in the medical reports submitted to 21st Century, and we are directed to no evidence that the company's claims examiner had sufficient medical expertise to make such a diagnosis himself.[5] As to the fact that Wilson was studying in Australia (not on vacation, as the claims examiner baselessly asserted) in 2001, the Court of Appeal aptly observed that "it is as possible to suffer 'severe pain' in Australia as in Southern California."

21st Century, of course, was not obliged to accept Dr. Southern's opinion without scrutiny or investigation. To the extent it had good faith doubts, the insurer would have been within its rights to investigate the basis for Wilson's claim by asking Dr. Southern to reexamine or further explain his findings, having a physician review all the submitted medical records and offer an opinion, or, if necessary, having its insured examined by other physicians (as it later did). What it could not do, consistent with the implied covenant of good faith and fair dealing, was *ignore* Dr. Southern's conclusions without any attempt at adequate investigation, and reach contrary conclusions lacking any discernable medical foundation. (*Egan v. Mutual of Omaha Ins. Co.*, *supra*, 24 Cal.3d at p. 819; *Mariscal v. Old Republic Life Ins. Co.*, *supra*, 42 Cal.App.4th at p. 1623.) A jury could reasonably find 21st Century did so here.[6]

On the subject of further investigation, 21st Century criticizes the Court of Appeal's statement that "when proper adjustment of a claim turns on a medical evaluation of the insured's condition an insurer breaches its duty to thoroughly investigate the claim if it fails to have the insured examined by a doctor of its choice or at least to consult with the insured's treating physician." The appellate court, 21st Century argues, incorrectly held that the

---

[5] At oral argument, counsel for 21st Century opined that the claims examiner's assertion of preexisting degenerative disk disease was based on the MRI report's observation of "mild dextroscoliosis." But even assuming Wilson's mild scoliosis preexisted the accident, which the medical reports do not assert, there is nothing in the reports to suggest it contributed to her neck pain. Nor is any medical basis apparent for the claims examiner's equation of scoliosis with degenerative disk disease. Scoliosis can have many causes, including hip disease, asymmetric muscle spasms, rickets, and ophthalmological dysfunction. (Stedman's Medical Dict., *supra*, at p. 1606.)

[6] 21st Century observes that after its claims examiner told plaintiff's attorney, Hall, of his opinion that the submitted medical reports did not support the claim of cervical disk injury from the accident, Hall did not argue the point further or immediately send additional medical information. 21st Century maintains this relieved it of any duty to further assess or evaluate the claim, at least until it received more information. But Hall had *already* drawn the claims examiner's attention to Dr. Southern's report and opinion. A jury could find that the insurer's willingness to receive additional information did not conclusively demonstrate its good faith in disregarding the information already provided.

failure to order an examination is bad faith in all cases, while regulations of the Insurance Commissioner indicate an insurer should ask for an independent examination only when it believes it reasonably necessary. (See Cal. Code Regs., tit. 10, § 2695.7, subd. (n).) We agree that, the critical issue being the reasonableness of the insurer's conduct under the facts of the particular case, stating a general rule as to how much or what type of investigation is needed to meet the insurer's obligations under the implied covenant is difficult. An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions. (*Nager v. Allstate Ins. Co.* (2000) 83 Cal.App.4th 284, 288 [99 Cal.Rptr.2d 348]; *Walbrook Ins. Co. v. Liberty Mutual Ins. Co.* (1992) 5 Cal.App.4th 1445, 1455–1456 [7 Cal.Rptr.2d 513].) In some cases, review of the insured's submitted medical records might reveal an indisputably reasonable basis to deny the claim without further investigation. But as the Court of Appeal explained in passages following the statement 21st Century criticizes, and as we demonstrate above, under the facts of this case a triable issue of fact exists as to whether it was reasonable to deny Wilson's claim on the grounds stated without further medical investigation.

## II. *The Genuine Dispute Rule*

■ As discussed earlier, an insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable. (*Frommoethelydo v. Fire Ins. Exchange, supra,* 42 Cal.3d at pp. 214–215.) As a close corollary of that principle, it has been said that "an insurer denying or delaying the payment of policy benefits due to the existence of a genuine dispute with its insured as to the existence of coverage liability or the amount of the insured's coverage claim is not liable in bad faith even though it might be liable for breach of contract." (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347 [108 Cal.Rptr.2d 776].) This "genuine dispute" or "genuine issue" rule was originally invoked in cases involving disputes over policy interpretation, but in recent years courts have applied it to factual disputes as well. (See *id.* at p. 348; *Fraley v. Allstate Ins. Co.* (2000) 81 Cal.App.4th 1282, 1292–1293 [97 Cal.Rptr.2d 386]; *Guebara v. Allstate Ins. Co.* (9th Cir. 2001) 237 F.3d 987, 992–994.)

The genuine dispute rule does not relieve an insurer from its obligation to thoroughly and fairly investigate, process and evaluate the insured's claim. A *genuine* dispute exists only where the insurer's position is maintained in good faith and on reasonable grounds. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at pp. 348–349;

*Guebara v. Allstate Ins. Co., supra,* 237 F.3d at p. 996.)[7] Nor does the rule alter the standards for deciding and reviewing motions for summary judgment. "The genuine issue rule in the context of bad faith claims allows a [trial] court to grant summary judgment when it is undisputed or indisputable that the basis for the insurer's denial of benefits was reasonable—for example, where even under the plaintiff's version of the facts there is a genuine issue as to the insurer's liability under California law. [Citation.] . . . On the other hand, an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably." (*Amadeo v. Principal Mut. Life Ins. Co.* (9th Cir. 2002) 290 F.3d 1152, 1161–1162.) Thus, an insurer is entitled to summary judgment based on a genuine dispute over coverage or the value of the insured's claim only where the summary judgment record demonstrates the absence of triable issues (Code Civ. Proc., § 437c, subd. (c)) as to whether the disputed position upon which the insurer denied the claim was reached reasonably and in good faith.

Contending its denial of Wilson's claim rested on a genuine dispute as to the true value of the claim, 21st Century posits three grounds for factual dispute. First, 21st Century notes that the initial X-ray of Wilson's cervical spine, ordered by Dr. Jackson, was described by the radiologist as "normal" and as showing "no fracture, degenerative change or soft tissue swelling." Wilson, of course, never claimed she had suffered a spinal fracture. She relied, in her attorney's June 2001 demand letter, on Dr. Southern's diagnosis of degenerative disk changes resulting from the accident. 21st Century, in response, did not take the position that Wilson had no degenerative changes to her cervical disks. Rather, it denied the claim on the ground that the disk damage was "preexisting." As we have already explained, a jury could find that 21st Century lacked any factual basis for that conclusion and that in reaching it the company had unfairly ignored medical evidence submitted by its insured.[8] As a dispute based on such an unreasonable position is not genuine, summary judgment was not proper on this ground.

---

[7] In this connection, we find potentially misleading the statements in some decisions to the effect that under the genuine dispute rule bad faith cannot be established where the insurer's withholding of benefits "is reasonable *or* is based on a legitimate dispute as to the insurer's liability." (*Delgado v. Interinsurance Exchange of the Automobile Club* (2007) 152 Cal.App.4th 671, 691 [61 Cal.Rptr.3d 826], italics added, quoting *Century Surety Co. v. Polisso* (2006) 139 Cal.App.4th 922, 949 [43 Cal.Rptr.3d 468]; see also *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra,* 90 Cal.App.4th at p. 346 [" 'if reasonable or if based on a legitimate dispute' "]; *Tomaselli v. Transamerica Ins. Co.* (1994) 25 Cal.App.4th 1269, 1281 [31 Cal.Rptr.2d 433] [same].) In the insurance bad faith context, a dispute is not "legitimate" unless it is founded on a basis that is reasonable under all the circumstances.

[8] Moreover, even had 21st Century asserted, in denying the claim, that the initial X-ray demonstrated the absence of spinal injury, a jury could reasonably find such a conclusion to have been reached unreasonably and without due consideration of the competing evidence, to wit, the second set of X-rays, the MRI report and Dr. Southern's clinical evaluation.

Second, 21st Century argues that the fact Wilson had only $4,275 in medical expenses when she made her claim, most of it for diagnosis rather than treatment, indicated to the company that Wilson was not seriously injured. At the time it denied Wilson's claim, however, 21st Century did not cite the relatively modest size of Wilson's medical bills as a ground for denial. In any event, the basis for Wilson's policy limits claim, as communicated in her attorney's demand letter, was not that the neck injury was so severe as to require expensive treatment in the short term, but rather that it was continuing to cause her significant pain and "at an incredibly young age, [Wilson] now faces degenerative disk changes" that could leave her in pain for the rest of her life. The relatively low medical bills incurred in the first few months after the accident would not have been a reasonable basis for disputing the size of Wilson's future damages due to future pain and suffering even had 21st Century asserted such a position, which it did not. For these reasons, the size of the medical bills submitted did not entitle 21st Century to judgment as a matter of law; summary judgment was not proper on this ground.

Finally, 21st Century relies on Wilson's "extensive travels in 2001," to wit, her trip to Europe after the accident and her period of study in Australia later in 2001. The claims examiner cited the Australia trip, but not that to Europe, as grounds for denial in his internal memo and in his telephone conversation with Wilson's attorney. As already explained, however, a jury could find 21st Century had no basis for concluding that Wilson's period of studying and traveling in Australia contradicted her claim of continuing significant neck pain and could therefore find that the examiner raised the Australia trip not in genuine dispute of her claim's value, but as a pretext or rationalization for denying it.[9] Summary judgment was not proper on this ground either.

The dissenting opinion's argument for existence of a genuine dispute rests on an important misapprehension regarding the record. Plaintiff's June 2001 demand for the policy limits did not depend on anticipated future special damages for spinal surgery, as the dissent suggests by its emphasis on medical disagreement over whether surgery was recommended. (Dis. opn., *post*, at pp. 727–728.) Rather, plaintiff's demand rested largely on asserted *general damages* for the lifelong consequences of what Dr. Southern found to be probable degenerative disk changes. A jury could reasonably find that the

---

[9] Dr. Southern's report noted that while traveling in Europe Wilson "had significant problems carrying her backpack around and the hand would go numb constantly." The insurer now argues that "[t]hose who have experienced serious neck injuries usually do not travel to Europe shortly thereafter, carrying their belongings in a way certain to cause substantial neck strain." But 21st Century directs us to no medical opinion in the summary judgment record to the effect that Wilson's continuing neck pain was caused by her use of a backpack rather than the automobile accident.

lack of a clear spinal surgery recommendation as of July 2001 was not a reasonable basis for ignoring Dr. Southern's clinical evaluation.

### III. *Other Issues*

Turning from the question of a triable factual issue regarding its bad faith denial of the claim, 21st Century contends Insurance Code section 11580.26, subdivision (b) renders it immune from suit on this cause of action. That statute bars a cause of action for "exercising the right to request [UIM] arbitration," but has been held not to abrogate an insurer's duty to handle UIM claims in good faith. (See *Hightower v. Farmers Ins. Exchange* (1995) 38 Cal.App.4th 853, 861–863 [45 Cal.Rptr.2d 348].) Because 21st Century did not timely raise this issue in the Court of Appeal, however, we decline to address it. (Cal. Rules of Court, rule 8.500(c)(1).) We also do not address issues briefed by Wilson that were not presented by the petition for review or answer. (Cal. Rules of Court, rule 8.520(b)(3).)

### CONCLUSION

The summary judgment record demonstrates the existence of triable issues of fact as to whether, before rejecting Wilson's UIM claim in July 2001, 21st Century thoroughly investigated and fairly evaluated the claim. Wilson presented sufficient evidence for a jury to find 21st Century's decision was " 'prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement.' " (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co., supra*, 90 Cal.App.4th at p. 346.) 21st Century was therefore not entitled to judgment as a matter of law on Wilson's bad faith cause of action, and the trial court erred in granting summary judgment to the insurer.

### DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Kennard, J., Moreno, J., and Kline, J.,* concurred.

**CHIN, J.,** Dissenting.—I cannot agree with the majority's conclusion that defendant 21st Century Insurance Company (21st Century) acted unreasonably and in bad faith when it delayed paying the policy limits on plaintiff's

---

*Presiding Justice of the Court of Appeal, First Appellate District, Division Two, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

underinsured motorist claim. The radiologist who viewed a postaccident cervical spine X-ray in conjunction with plaintiff's own doctors, Community Hospital of Monterey Peninsula, and Pueblo Radiology concluded that plaintiff's cervical spine appeared "normal," with "[m]ild straightening of lordosis" but "no fracture, degenerative change or soft tissue swelling." Plaintiff then went on an extended backpacking trip to Europe *after* the accident. All of this, together with plaintiff's low initial medical bills, make 21 Century's initial actions in evaluating coverage very reasonable.

It was not until after plaintiff returned from Europe, and before a planned trip to Australia, that she first sought the medical opinion of Dr. Southern, an orthopedist, for the cause of her continuing neck pain. Dr. Southern told plaintiff that if the magnetic resonance imaging scan he ordered was "markedly abnormal" she should postpone her trip to Australia. But when the results arrived he did not advise her to alter her plans, and she traveled in Australia for 10 months.

In June 2001, while plaintiff was still in Australia, her attorney sent a demand letter to 21st Century for a policy limits payment. The insurer invited plaintiff's attorney to submit any additional medical records that might cause it to revise its claim value assessment, but the attorney said that he had nothing more to submit. After 21st Century offered plaintiff her medical payment reimbursement of $5,000 and denied the policy limits demand, plaintiff initiated statutory arbitration in July 2001, under Insurance Code section 11580.2.

Before the arbitration hearing, and after plaintiff returned from Australia in December 2001, she again saw Dr. Southern, who recommended a treatment regimen of physical therapy and antiinflammatory medications. He did not recommend surgery. It was not until plaintiff's June 2002 deposition in the arbitration proceeding, and for the first time in the two-year postaccident period, that plaintiff revealed that one of her doctors (Dr. Spencer) had recommended spinal fusion surgery. Following that recommendation, however, plaintiff sought another medical opinion from Dr. Szper (a neurosurgeon) who noted a "slight disc bulge" but found "nothing in my eyes which appears to be surgical." Dr. Szper recommended against surgery, and suggested plaintiff undergo pain management instead.

In light of plaintiff's arbitration testimony that revealed the conflicting expert views, 21st Century promptly and reasonably sought an independent medical opinion to corroborate plaintiff's medical expert's opinions. The insurer's medical experts, Drs. Nagelberg and Chafetz, initially opined that surgery was not advisable, agreeing with at least one of plaintiff's own medical experts. It was not until after Dr. Nagelberg was given a full

diskogram report that he recommended surgical intervention in a supplemental report to 21st Century. Thus, 21st Century *fulfilled* its statutory obligation to seek an independent medical opinion in light of Dr. Spencer's opinion that plaintiff might benefit from surgery. (Ins. Code, § 790.10; Cal. Code Regs., tit. 10, § 2695.7, subd. (n) [mandates that insurer requesting medical examination for purpose of determining liability shall do so only when insurer has good faith belief that examination is reasonably necessary].) 21st Century thereafter revised its assessment of the claim's value and authorized payment to the insured of the $85,000 remainder of her underinsured motorist policy limit.

I agree that we must evaluate the insurer's reasonableness under a "totality of the circumstances" standard. But contrary to the majority's view, the totality of the circumstances here shows that even plaintiff's experts had difficulty agreeing on the extent of her injury or the proper course of treatment.

If an insurance company reasonably and legitimately disputes coverage, summary judgment for the insurer is proper in a bad faith action even if it is later determined that the insurer did owe policy benefits. (*Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 347–349 [108 Cal.Rptr.2d 776] [tortious bad faith damages not imposed when insurer's initial failure to discharge contractual obligations was prompted by bad judgment or negligence]; see also Croskey et al., Cal. Practice Guide: Insurance Litigation (The Rutter Group 2006) ¶ 12:837.1, pp. 12C-13.) In other words, a *mistaken* withholding of benefits or delay in payment is not bad faith where it is reasonable or based on a genuine dispute as to the insurer's liability. (See *Rappaport-Scott v. Interinsurance Exchange of the Automobile Club* (2007) 146 Cal.App.4th 831, 834–837 [53 Cal.Rptr.3d 245] [applying genuine dispute doctrine to preclude bad faith in underinsured motorist action]; see also *Opsal v. United Services Auto. Assn.* (1991) 2 Cal.App.4th 1197, 1205 [10 Cal.Rptr.2d 352] [before insurer can be found to have acted tortiously or in bad faith in refusing to bestow policy benefits, it must have done so " ' "without proper cause" ' "].) Given the fact that plaintiff's own experts could not agree on the extent of her injuries, 21st Century reasonably disputed the extent and severity of plaintiff's injuries.

The majority's holding can only drive up the cost of underinsured motorist insurance—contrary to the clear public policy of keeping the costs of such insurance low. (See, e.g., *Yoshioka v. Superior Court* (1997) 58 Cal.App.4th 972, 984 [68 Cal.Rptr.2d 553] [noting that uninsured (and hence, underinsured) motorist laws reflect the electorate's interest "in controlling the high costs of insurance"].) By allowing plaintiff to proceed with her lawsuit for bad faith even though a genuine dispute existed over the extent of her injuries

until 21st Century paid the policy limits, the majority encourages unwarranted and costly lawsuits, the unnecessary hiring of doctors and lawyers, and the resulting increase in our automobile insurance premiums. 21st Century's reasonable and cautious behavior in light of the facts here should be encouraged on behalf of all consumers, not punished.

Accordingly, I dissent.

Baxter, J., concurred.

On December 19, 2007, the opinion was modified to read as printed above.