Filed 5/11/23  Zepeda v. First American Specialty Ins. Co. CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| MIGUEL ZEPEDA, | |
| Plaintiff and Appellant, | G060649 |
| v. | (Super. Ct. No. 30-2019-01120950) |
| FIRST AMERICAN SPECIALTY INSURANCE COMPANY, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Stephanie George, Judge.  Affirmed.

Kerley Schaffer, Dylan L. Schaffer and Rudy Tap for Plaintiff and Appellant.

Dentons US, Sonia R. Martin, Samuel D. Jubelirer, Joel D. Siegel and Ronald Kent for Defendant and Respondent.

\*          \*          \*

A windstorm damaged the roof and electrical system of a rental property (the property or the house) owned by plaintiff Miguel Zepeda. Within a few weeks of the incident, his insurer, defendant First American Specialty Insurance Company (First American), had sent a third party adjustor to inspect the property and mailed Zepeda a check in the amount of the adjustor's repair estimate. Zepeda later filed this bad faith insurance action against First American, claiming it had failed to thoroughly investigate the damage to the property, that the adjustor's estimate was unreasonably low, and that First American misrepresented his rental coverage. The trial court granted summary judgment in favor of First American, which Zepeda now appeals.

We affirm the judgment. Zepeda has failed to show the electrical repairs he wants First American to cover are within his policy's coverage. He has also failed to show that First American ever denied him any benefits with regard to the roof repair. Significantly, Zepeda never attempted to repair the roof after being given authorization to proceed, nor did he ever inform First American that its repair estimate was insufficient. Finally, although a First American employee gave Zepeda an explanation of his rental coverage that was not entirely accurate, it was not so unreasonable as to constitute bad faith.

I

FACTS AND PROCEDURAL HISTORY

The property is located in Madera, California (the City).[1] On December 4, 2018, the property's electrical system and roof were damaged when a windstorm blew

---

[1] First American objected to some of the evidence cited in this section. Since the trial court did not rule on any of their objections, they were presumptively overruled. We will consider this evidence since First American did not reraise any of its evidentiary objections on appeal. (*Duffey v. Tender Heart Home Care Agency, LLC* (2019) 31 Cal.App.5th 232, 251, fn. 17.)

2

down part of a tree in the backyard. The next day, Zepeda, a licensed electrician, inspected the property and obtained a permit from the City to repair the electrical system.

Zepeda repaired the property's electrical system through his company, Highland Electrical Construction (Highland), on December 6, 2018. Among other things, Highland removed a damaged 100-amp breaker panel (the damaged panel) at the property and replaced it with a 200-amp breaker panel (the replacement panel), which was the only spare panel available in Zepeda's warehouse. Several wires had to be spliced to be connected to the replacement panel. That same day, an inspector from the City approved the repaired electrical work and certified the house for occupancy. Though the house was certified for occupancy on December 6, it was apparently without power for 11 days.

One of the primary disputes in this case requires us to distinguish between nonarc fault circuit breakers and arc fault circuit breakers. Broadly speaking, arc fault breakers are safer than nonarc fault breakers because they reduce the risk of electrocution. Specifically, they distinguish between a harmless arc incidental to normal operation of switches and plugs and a dangerous arc that may cause a fire. The record shows arc fault breakers have become the industry standard for good and workmanlike construction.

Here, the damaged panel had nonarc fault breakers, and the replacement panel also had nonarc fault breakers. In this lawsuit, though, Zepeda maintains the replacement panel was only a temporary fix. He believes First American is required to cover installation of an arc fault breaker panel on the property. As far as the record shows, the replacement panel is still installed on the property. To install an arc fault breaker, the entire house will need to be rewired. Based on an expert declaration in the record, these repairs will take about six months and cost around $70,000.

On December 7, 2018, a day after the house was certified for occupancy by the City, Zepeda notified First American of the loss and spoke to an adjuster named Gordon Carle. Among other things, Zepeda told Carle a tree had damaged his electrical

3

system and that he had temporarily installed the replacement panel.  Carle sent Zepeda a letter acknowledging the claim that same day.  The letter included a claim number and instructed Zepeda "to include the claim number on all future correspondence."  Carle sent Zepeda an email on December 12, 2018, stating, "[p]er our prior conversation, you are approved to continue with roof repairs while taking repairs of the damages, before and after."  The email also instructed, "[p]lease send all claim correspondence to myclaims@firstam.com.  Must include claim number in email reference.  Under no circumstances is claim correspondence to be directed to the First American employee's email address alone."

On December 14, 2018, Zepeda sent Carle an email asking, "[j]ust for clarification, you are approving all damages that are claim related, correct? . . .  There will be some loss of rent that will be covered, correct?  I'm relying on you as I don't clearly understand my coverage."  Carle replied less than an hour later, stating, "[t]here is coverage for loss of rents for the time the tenants had to be out of the home, so please forward a copy of your lease agreement when you get a chance to: myclaims@firstam.com.  [¶]  I'll be able to advise you more once I review the adjuster's report and review your policy."  Zepeda never sent a copy of the relevant lease to myclaims@firstam.com, Carle, or anyone else at First American prior to filing this lawsuit.

First American retained a third party adjustor, Terri Barcus of Ryze Claim Solutions, to inspect the property.  Barcus inspected the property on December 12, 2018, and Carle sent Barcus' repair estimate to Zepeda in early January 2019.  The estimate allocated funds for replacement of the damaged panel, roof repair, tree removal, and clearing debris.  Along with the estimate were two checks from First American.  The first, in the amount of $1,884.31, represented the estimated repair costs to the house minus Zepeda's $1,000 deductible.  A second check totaling $270.42 was provided for payment for "other structures."  At the end of the letter, Carle stated, "if you have any

4

questions or concerns about this letter, please call me." Carle's signature block included his phone number and extension.

On January 7, 2019, Zepeda emailed Carle, asking for an update on his claim. Carle responded the next day, stating, "[t]he adjuster's inspection report and recommended repair estimate has arrived. We are almost done processing the settlement payment, which should go out to you by this Friday or Monday at the latest." After Zepeda received the check and estimate, he called Carle at an unspecified point in January 2019 and left a voicemail stating he had questions regarding the estimate and check. Carle did not return the call.

Zepeda had a licensed contractor, Robert Bresee, assist him in determining the scope of repairs at the property. Bresee ordered environmental testing for the property, and an environmental report was completed in March 2019 (the environmental report). Bresee then emailed Zepeda to inform him contaminants, including lead and asbestos, had been found in certain materials at the property. Bresee attached a copy of the environmental report to the email. The environmental report recommended that materials containing contaminants be removed before any renovation or demolition work occurred at the property. Zepeda forwarded Bresee's email to Carle at his First American email account on March 18, 2019, but the parties dispute whether the environmental report was attached to the forwarded email. It is undisputed that the forwarded email was not sent to myclaims@firstam.com, nor did it include the claim number. Zepeda called Carle again in March 2019 and left another voicemail stating he had questions about his claim. Carle did not return the call.

Zepeda filed this lawsuit against First American in December 2019, alleging First American had (1) violated Insurance Code section 2051 by improperly deducting depreciation from the value of the property, and (2) breached the implied covenant of good faith and fair dealing. During discovery, Zepeda produced several documents to First American, including (1) an income statement for $682.50, reflecting

5

11 days of lost rent while the property was without power, (2) a permit invoice from the City for $53.97, (3) a $4,100 invoice from Highland for the repairs it performed on the property,[2] (4) a $101.57 invoice for the cost of materials used by Highland to repair the property, and (5) the environmental report. It is undisputed that Zepeda had not sent any of these documents, except the environmental report, to First American prior to their production in discovery. As noted above, the parties dispute whether Zepeda sent the environmental report to Carle in March 2019.

After receiving the above documents in discovery, First American issued three supplemental payments to Zepeda. First, a payment of $3,093.73, "comprised of the total amount of the temporary electrical unit including building permits and contractor costs ($4,255.54) after First American's previous electrical payment ($1,161.81) [was] deducted." The second payment of $682.50 was "for the requested pro-rated loss of rent amount while the home was without electricity." The third payment of $543 was meant to cover the cost of environmental testing.

First American filed a motion for summary judgment in March 2021, arguing both causes of action lacked merit and Zepeda was not entitled to punitive damages as a matter of law. As to the bad faith claim, First American argued it had paid all estimates and invoices it received relating to the loss. Further, it maintained that it had acted reasonably by hiring a third party adjustor to inspect the property and promptly paying the repair estimate. In response, Zepeda conceded his depreciation claim under Insurance Code section 2051 lacked merit. But he argued there were disputed issues of fact as to the bad faith claim, specifically, whether First American had (1) misrepresented his rental coverage; (2) failed to communicate with him after paying the estimate in January 2019; (3) failed to hire a competent licensed professional to inspect the property;

---

[2] The invoice described the work performed as "[d]emo and safe off old service panel. Install temp panel. Pull city permit. Have PG and E power up temp power."

and (4) failed to provide coverage for the complete repair of the house, which he estimated to be $70,000.

The trial court granted summary judgment in favor of First American, finding there was insufficient evidence "for reasonable minds to differ as to whether [First American] acted in bad faith." It reasoned, there was no evidence First American had denied Zepeda's claim or discontinued policy payments after making its investigation. Further, it was undisputed that Zepeda had failed to send First American invoices and material documents prior to filing this lawsuit. And regardless of whether Zepeda had forwarded the environmental report to Carle, it was undisputed that he had failed to send it to "myclaims@firstam.com" and to include the claim number, as instructed. Finally, Zepeda "never performed any other repairs, secured any other repair estimates, or sent any competing estimate or other documentation to [First American]." The court subsequently entered judgment in favor of First American.

On appeal of the summary judgment ruling, Zepeda's arguments largely fall into two theories. First, First American failed to thoroughly investigate the damage to the property and gave him insufficient funds to repair it. Second, First American misrepresented his rental coverage and denied him rental benefits due under the policy. Based on the undisputed facts, we find First American did not act in bad faith as a matter of law and affirm the judgment.

II

DISCUSSION

A. Applicable Law

"'A trial court properly grants a motion for summary judgment only if no issues of triable fact appear and the moving party is entitled to judgment as a matter of law. [Citations.] The moving party bears the burden of showing the court that the plaintiff "has not established, and cannot reasonably expect to establish,"' the elements of

7

his or her cause of action." (*Wilson v. 21st Century Ins. Co.* (2007) 42 Cal.4th 713, 720 (*Wilson*).) On appeal, ""although we use a de novo standard of review . . . , we do not transform into a trial court."" [Citation.] We approach a summary judgment appeal, as with any appeal, with the presumption the appealed judgment is correct. [Citation.] Therefore, ""[o]n review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court."""" (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684.) Further, an appellate court will "affirm the ruling if it is correct on any ground, regardless of the trial court's stated reasons." (*JEM Enterprises v. Washington Mutual Bank* (2002) 99 Cal.App.4th 638, 644.)

Bad faith insurance claims are based on the implied covenant of good faith and fair dealing. (*Wilson*, *supra*, 42 Cal.4th at p. 720.) "'The implied promise requires each contracting party to refrain from doing anything to injure the right of the other to receive the agreement's benefits. To fulfill its implied obligation, an insurer must give at least as much consideration to the interests of the insured as it gives to its own interests.'" (*Ibid.*) "[A]n insurer's denial of or delay in paying benefits gives rise to tort damages only if the insured shows the denial or delay was unreasonable." (*Id.* at p. 723.) If an insurer's conduct is "objectively reasonable, its subjective intent is irrelevant." (*Morris v. Paul Revere Life Ins. Co.* (2003) 109 Cal.App.4th 966, 973.)

A plaintiff asserting a bad faith "claim must show that the conduct of the defendant . . . demonstrates a failure or refusal to discharge contractual responsibilities, prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act, which unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party thereby depriving that party of the benefits of the agreement." (*Chateau Chamberay Homeowners Ass'n v. Associated Internat. Ins. Co.* (2001) 90 Cal.App.4th 335, 346.) "[T]he reasonableness of the insurer's decisions and actions must be evaluated as of the time that they were made; the evaluation cannot

fairly be made in the light of subsequent events that may provide evidence of the insurer's errors." (*Id.* at p. 347.) The reasonableness of an insurer's conduct is typically a question of fact, but it can be decided as a matter "of law where the evidence is undisputed and only one reasonable inference can be drawn from the evidence." (*Id.* at p. 346.) But "'an insurer is not entitled to judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.'" (*Wilson*, *supra*, 42 Cal.4th at p. 724.)

## B. Procedural Arguments

Before reviewing Zepeda's substantive arguments, we first address First American's contentions that his appeal fails on various procedural grounds. First, it asserts Zepeda failed to comply with California Rules of Court, rule 8.204(a)(1)(C), which requires parties to support facts in their briefs with citations to the volume and page number in the record. (See *Young v. Fish and Game Com.* (2018) 24 Cal.App.5th 1178, 1190-1191 [courts may deem waived any point that lacks citation].) Zepeda's briefs cite facts from his separate statement, but they largely fail to provide citations for any of the underlying evidence supporting those facts. We have not been cited any authority that squarely addresses this issue. Regardless, we choose not to exercise our discretion to ignore Zepeda's arguments. While his citations are incomplete and caused an inconvenience to the court, they provided enough information for us to locate the underlying evidence.

Second, First American contends several of Zepeda's arguments are outside the scope of the complaint and cannot be used to defeat summary judgment. It is true that a plaintiff cannot defeat a summary judgment motion by raising "'new *theories* [in its opposition] that could have been pled,'" in the complaint but were not. (*Jacobs v. Coldwell Banker Residential Brokerage Co.* (2017) 14 Cal.App.5th 438, 444, italics added.) However, a plaintiff can raise new *factual* issues at summary judgment "if the

9

controlling pleading, construed broadly, encompasses them." (*Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1257.) Here, the complaint asserted several theories of bad faith, for example, that First American (1) "unreasonably fail[ed] to conduct a full, fair, and objective investigation of the damage," (2) "misrepresent[ed] and conceal[ed] pertinent facts, policy benefits, and coverages," and (3) "requir[ed] [Zepeda] to file a lawsuit in order to obtain amounts owed under the Policy." While not all the facts Zepeda relies upon to defeat summary judgment were alleged in the complaint, they all relate to these three theories of liability. Thus, Zepeda could raise these factual issues at summary judgment.

## C. Failure to Investigate Property Damage

### 1. Electrical system

On appeal, Zepeda primarily contends there are several issues of fact as to whether First American acted unreasonably when investigating the portion of his claim relating to the property's damaged electrical system. Generally, he asserts (1) First American unreasonably relied on Barcus' investigation and estimate because she is not a licensed electrician or contractor; (2) First American failed to determine the true cost of repairing the damaged panel, which Zepeda asserts is $70,000; and (3) it was unreasonable for Carle to not return Zepeda's calls in January and March 2019, and to ignore the environmental report and email that Zepeda forwarded in March 2019.

For purposes of our analysis, all of Zepeda's arguments on this issue arise from his assertion that the policy covers installation of an arc fault breaker panel. As mentioned above, Zepeda maintains the replacement panel he installed, which was a nonarc fault panel, was only temporary and that an arc fault breaker needs to be installed on the property. To install an arc fault breaker, the entire house will need to be rewired, which will require demolition work to the property and abatement of hazardous materials. This work will take about six months and cost $70,000. Zepeda maintains Barcus'

10

investigation and estimate were unreasonable because they failed to anticipate the necessary work and cost to install an arc fault breaker. Nor did First American take any other actions to estimate these costs. Finally, Zepeda believes the ignored phone calls and environmental report show First American had no interest in determining the true cost to repair the property. As explained below, Zepeda's arguments are unpersuasive because he has failed to show the policy covers installation of an arc fault breaker panel. There can be no bad faith claim without coverage.

"[A]n insurer may breach the implied covenant of good faith and fair dealing by failing to properly investigate its insured's claim." (*Eigner v. Worthington* (1997) 57 Cal.App.4th 188, 195.) There is no "general rule as to how much or what type of investigation is needed to meet the insurer's obligations under the implied covenant . . . . An insurer's good or bad faith must be evaluated in light of the totality of the circumstances surrounding its actions." (*Wilson*, *supra*, 42 Cal.4th at p. 723.) However, an insurer's failure to investigate is not actionable if there is no coverage. (*Old Republic Ins. Co. v. FSR Brokerage, Inc.* (2000) 80 Cal.App.4th 666, 684-685.) As explained by our Supreme Court, "when benefits are due an insured, 'delayed payment based on inadequate or tardy investigations, oppressive conduct by claims adjusters seeking to reduce the amounts legitimately payable and numerous other tactics may breach the implied covenant because' they frustrate the insured's right to receive the benefits of the contract in 'prompt compensation for losses.' [Citation.] Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and 'should not be endowed with an existence independent of its contractual underpinnings.'" (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 36.)

Under the policy, losses to buildings were covered "at replacement costs without deduction for depreciation. [First American would] pay no more than the smallest of the following amounts for *equivalent* construction and use on the same premises. [¶] . . . [¶] (1) 100% of the *replacement cost* of the building or any parts of it.

11

[¶] (2) 100% of the amount actually and necessarily spent to repair or replace the building or any parts of it. [¶] (3) The applicable limit of liability whether increased or not, adjusted in accordance with paragraph 1. above." (Italics added.)

Zepeda has failed to meet his burden of showing that installation of an arc fault breaker panel and the consequential repairs are covered under the policy. It is undisputed that the property had a nonarc breaker panel prior to the incident. Zepeda has failed to cite anything in the record or any authority supporting his view that installation of an arc fault breaker is covered by the policy. Rather, he presumes coverage without providing any reasoned explanation. The policy covers "equivalent construction" and the "replacement cost" of any parts of the house. Zepeda has not reconciled this language from the policy with his demand for installation of an arc fault breaker. Put differently, it is unclear how installation of an arc fault breaker is an "equivalent construction" to or within the scope of "replacement cost" of a nonarc fault breaker. While Zepeda briefly argues that coverage is a question for the jury to determine, interpretation of the meaning and application of an insurance provision is generally a matter of law that courts can determine at summary judgment. (See *Lebas Fashion Imports of USA, Inc. v. ITT Hartford Ins. Group* (1996) 50 Cal.App.4th 548, 555.)

Zepeda has not met his burden of showing coverage, so his appeal fails as to this issue. (See *Meridian Financial Services, Inc. v. Phan*, *supra*, 67 Cal.App.5th at p. 684.) In other words, because he has not shown coverage, it is irrelevant whether First American acted unreasonably by (1) relying on Barcus' investigation, (2) failing to determine the cost of repairing the damaged panel, and (3) not returning Zepeda's two calls and e-mail in January and March 2019. (*Old Republic Ins. Co. v. FSR Brokerage, Inc.*, *supra*, 80 Cal.App.4th at pp. 684-685.)

Further, our analysis of the record and the relevant policy language indicates installation of an arc fault breaker is not covered. "To resolve a question of policy interpretation, the court performs an independent review, looking first to the

12

language of the insurance policy in order to ascertain its plain meaning as a layperson would understand it. . . . The plain meaning of a policy provision governs, and an insured's reasonable expectations are not considered except where the policy provisions are ambiguous. [Citation.] The opinions of claims adjusters or other agents or employees of the insurer are also inadmissible to interpret an insurance contract." (*Prudential Ins. Co. of America, Inc. v. Superior Court* (2002) 98 Cal.App.4th 585, 598-599.)

From our review of the record, the policy does not define "replacement cost." Black's Law Dictionary defines "replacement cost" as "[t]he cost of a substitute asset that is equivalent to an asset currently held." (Black's Law Dict. (11th ed. 2019) p. 437, col. 1.) Likewise, Merriam-Webster Dictionary defines it as "the cost of replacing property with property of like kind and equal quality or effectiveness." (Merriam-Webster Dict. Online (2023) https://www.merriam-webster.com/legal/replacement%20cost [as of May 11, 2023], archived at https:/perma.cc/7S99-TVT7.) Thus, under the most straightforward interpretation of "replacement cost," Zepeda was entitled to an equivalent replacement for a damaged nonarc fault breaker panel, which is a new nonarc fault breaker panel.

Zepeda argues that policies like the one at issue "contemplate that repair of damage at older homes consistent with codes and updated understanding of building safety may result in improvement." Likewise, the policy states that "reasonable substitutions for like kind and quality construction may be made if needed, to provide for features of the structure that are unusual or cannot be replaced." But nothing in the record shows the damaged panel needed to be replaced with an arc fault breaker panel instead of a nonarc fault breaker panel. We have not been cited to anything in the record or any applicable authority requiring installation of arc fault breakers in residential properties. Nor does anything in the record indicate that installing a nonarc fault breaker panel renders the property unsafe for habitability. Indeed, during his deposition, Zepeda

13

was asked whether he believed the property was safe for habitation following installation of the replacement panel. He answered, "I believe so."

The record only shows that nonarc fault units "are not as safe as arc-fault units" and that "arc-fault breakers have become industry standard and meet the accepted trade standards for good and workmanlike construction for residential construction." But these record citations do not establish that arc fault breakers are required by any authority or that replacing the damaged panel with a nonarc fault breaker panel violates any applicable standard. Thus, as argued by First American, installation of an arc fault breaker panel, and all the required consequential repairs, would represent a significant upgrade to the property that is outside the policy's coverage.

Zepeda also asserts that it was Barcus who recommended installation of an arc fault breaker panel, but she failed to properly investigate how much its installation would cost. While, the Barcus' estimate calls for installation of a "125 amp w/arc fault breakers," it is undisputed that Barcus was making an estimate, not a coverage determination. Her estimate does not effect our interpretation of the policy. (*Prudential Ins. Co. of America, Inc. v. Superior Court*, *supra*, 98 Cal.App.4th at pp. 598-599.) Further, the record shows Barcus did not recommend installation of an arc fault breaker panel because she believed it was covered under the policy. She admitted during deposition that she did not know whether the damaged panel was an arc fault breaker or not. Indeed, she did not know the difference between an arc fault breaker panel and nonarc fault breaker panel. At deposition, she explained that "I was just looking for pricing and I probably chose the more expensive breaker panel. Just to make sure [Zepeda] had enough wiggle room there because I did not have the final invoice and I did not want to hold up the claim."

Zepeda also appears to argue that he only made temporary repairs to the breaker panel and that First American failed to provide funds for a permanent repair. But the only permanent repair Zepeda has identified is installation of an arc fault breaker

14

panel.  We have not been cited to any other evidence in the record explaining what other permanent repairs need to be made to the property's electrical system.

Similarly, Zepeda claims First American failed to timely pay the actual costs for the repairs he made to the electrical system in December 2018.  It did not pay the actual costs until after Zepeda filed this lawsuit.  But nothing in the record shows First American's delay was unreasonable.  Zepeda did not inform First American of his incurred repair costs until after filing this lawsuit.  It is also uncontested that he never sent First American any proof of his incurred costs (e.g., costs for permits, labor, or materials) until discovery in this lawsuit.  Given the record, we cannot rule First American acted unreasonably by failing to pay additional funds until Zepeda submitted supporting documentation in discovery.

### 2. Roof Repairs

While Zepeda's primary focus is on the damaged electrical system, he also briefly argues that First American unreasonably investigated the damage to his roof and failed to provide sufficient funds to fix it.  Barcus' estimate allocated $517.76 for roof repair.  In opposition to summary judgment, Zepeda submitted a declaration from Paul Herron, a contractor.  Herron did not examine the property firsthand, but based on his review of Barcus' estimate, the environmental report, and photographs of the damaged property, Herron opined the "[i]mpact from a tree would have caused damage to the waterproofing underneath the shingles as well as to the roof sheathing.  No investigation appears to have been done as to the damage.  No roofer will warrant a roof sustaining structural damage from a tree strike.  As such the roof covering needs to be removed for inspection, and the roof covering replaced in order to get a roof repair that is capable of being warranted.  The [Barcus] estimate also provides for the replacement of individual shingles, which is improper because it will cause issues with matching the remainder of the roof."  Herron estimates roof repair will cost at least $15,000.

15

"[A]n insurer cannot reasonably and in good faith deny payments to its insured without thoroughly investigating the foundation for its denial." (*Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 819.) In other words, to establish a claim for bad faith based on an inadequate investigation, a plaintiff must show the insurer unreasonably denied or delayed his claim. (See *ibid*; *Jordan v. Allstate Ins. Co.* (2007) 148 Cal.App.4th 1062, 1071-1072.) Here, there is no evidence showing that First American denied or delayed any policy benefits to Zepeda relating to property's roof. Five days after Zepeda made his claim to First American, Carle informed him via email that "[p]er our prior conversation, you are approved to continue with roof repairs while taking repairs of the damages, before and after." While First American authorized Zepeda to commence roof repairs, the record shows he never attempted to repair it. Nor did Zepeda ever inform First American prior to filing this lawsuit that the amount of Barcus' estimate was insufficient to repair the roof. In short, nothing in the record shows that First American ever denied Zepeda's claim or refused to provide funds to repair the roof.

Zepeda argues that he had no duty to present a competing estimate. He argues that he "had every right to receive First American's lowball estimate, conclude that it reflected an abject failure to comprehend the scope of the loss or to compensate him fairly under the policy and the law, and file suit." We disagree. The question is not whether Zepeda had a duty to act. Rather, we must look at whether there is any evidence showing First American deliberately denied Zepeda a benefit under the policy. Given the facts of this case, Zepeda has not shown any facts indicating that First American ever denied him such benefits. To repeat, it authorized repair of the roof. Yet Zepeda never attempted to fix the roof. Nor does anything in the record reflect that he notified First American that Barcus' estimate was too low. As such, there is nothing in the record showing First American was aware that Zepeda sought additional benefits under the

16

policy to repair the roof, let alone anything in the record showing it denied him such benefits.

Zepeda had no duty to provide a competing estimate, but he had to provide some evidence showing First American had knowledge that the Barcus' estimate was insufficient or that Zepeda was requesting additional funds to repair his roof. He has not done so. While Zepeda sent the environmental report in March 2019, Zepeda's briefs indicate the environmental report was related to the potential demolition work needed to rewire the property's electrical system, not the roof. Further, it is undisputed that Zepeda did not send the environmental report to myclaims@firstam.com, as instructed, nor did he include the claim number on the email. Thus, to the extent the environmental report had any bearing on the roof, we cannot find that it was unreasonable for First American to overlook it.

In support of his arguments, Zepeda relies heavily on *Wilson*, *supra*, 42 Cal.4th 713, and *Fadeeff v. State Farm General Ins. Co.* (2020) 50 Cal.App.5th 94). Both cases are inapposite. In both *Wilson*, and *Fadeeff*, the insurer indisputably denied the plaintiff's claim prior to the filing of the lawsuit. (*Wilson*, pp. 719-720; *Fadeeff*, at pp. 99-100.) In *Wilson*, the insurer rejected the insured's request for $85,000 in underinsured motorist coverage to pay for medical treatment. (*Wilson*, at p. 719.) The insurer sent a denial letter of the claim, stating the insured had already been fully compensated for her injuries and would receive no additional benefits. (*Ibid*.) In *Fadeeff*, the insurer paid the insured $50,000 for smoke damage to their home caused by a fire. (*Fadeeff*, at p. 98.) The insureds subsequently submitted supplemental claims totaling $75,000, which the insurer completely denied. (*Id*. at pp. 99-100.) Here, as set forth above, there was no similar denial of any benefits to Zepeda. Rather, First American told Zepeda he could commence repairs on the roof, which Zepeda never performed, and he also never informed First American that Barcus' estimate was insufficient.

17

*D. Rental Coverage*

The policy covered rental losses to the property if it became "unfit for its normal use." The relevant portion of the policy stated that First American would "cover the fair rental value of that part of the [property] rented to others or held for rental by you less any expenses that do not continue while that part of the [property] rented or held for rental is not fit to live in." "Payment [would] be for the shortest time required to repair or replace that part of the [property] rented or held for rental, but not to exceed one year from the date of the loss."

Zepeda claims Carle misrepresented the rental coverage when he stated, "[t]here is coverage for loss of rents for the time the tenants had to be out of the home, so please forward a copy of your lease agreement when you get a chance to: myclaims@firstam.com." He maintains this statement was misleading in three different ways. First, the policy does not condition benefits on "loss of rents" or income interruption. Second, Carle requested the lease even though the rental status of the house has no bearing on coverage. Third, Carle implied that coverage was only provided if the tenants left the property, when the actual test was whether the house was uninhabitable. Due to these misrepresentations, Zepeda claims he was misled into believing he had not suffered a covered loss because his tenants remained on the property while he prorated their rent for 11 days.

Our analysis of this claim turns on whether Carle's explanation of the policy benefits was objectively unreasonable. (See *Davis v. Blue Cross of Northern California* (1979) 25 Cal.3d 418, 428 [insurer has a "duty reasonably to inform an insured of the insured's rights and obligations under the insurance policy"]; *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847, 879 [an erroneous interpretation of an insurance provision is only bad faith if the insurer's conduct was unreasonable]; *Morris v. Paul Revere Life Ins. Co.*, *supra*, 109 Cal.App.4th at p. 973 [the court reviews an insurer's objective conduct].) Based on the undisputed

18

facts, we find Carle's statements are insufficient as a matter of law to support a bad faith claim.

As to Zepeda's first and third arguments, the policy "cover[ed] the fair rental value of [the property]" while it was "not fit to live in." Carle's statement that Zepeda was covered for lost rent while the "'tenants had to be out of the home,'" does not match the policy's coverage. For a variety of reasons, a tenant may choose to remain in their home while it "is not fit to live in" until it has been repaired. However, while Carle's explanation of the benefits was not entirely accurate, it was not objectively unreasonable. If a rental property "is not fit to live in," it is not unreasonable for an insurer to presume that its tenants will vacate the property while it is being repaired. The fact that the property "is not fit to live in," reasonably indicates the property is unsuitable for habitation and, consequently, the tenant will leave the property until it is habitable. Further, imposing liability on these facts would likely discourage insurers from trying to explain in laymen's terms the sometimes byzantine language of insurance policies. When asked coverage questions, to avoid bad faith misrepresentation claims, insurers would be encouraged to simply quote policy language instead of attempting to summarize or explain it. Such a practice would likely be unhelpful for most persons attempting to understand their coverage.

As to Zepeda's second argument, it was not unreasonable for First American to request a copy of the lease. If a policyholder is requesting coverage under a rental provision, it is not unreasonable for an insurer to request a copy of the lease to determine whether the property is currently being rented. Moreover, although the policy covers "fair rental value" rather than lost rent, the current rental price of the property – as reflected by the lease – provides evidence of its "fair rental value."

To the extent Zepeda argues First American acted in bad faith by delaying payment for rental benefits until after this lawsuit was filed, we are unpersuaded. It is undisputed that Zepeda failed to provide First American with a copy of the lease

19

agreement for the property.  Nor did he provide any evidence of lost rent until after filing this lawsuit.  It was reasonable for First American to withhold any rental benefits until after receiving this information.

Finally, Zepeda appears to suggest that First American must cover rent for the six-month period it will take to rewire his house and install an arc fault breaker and panel.  As discussed above, these repairs are not covered by the policy.

*E. Violations of Insurance Regulations*

Zepeda also argues that through the above actions, First American violated several provisions of the Insurance Code and other applicable regulations.  While such violations may provide evidence of an insurer's lack of reasonableness, "any particular violation of the regulations does not require a finding of unreasonable conduct."  (*Rattan v. United Services Automobile Assn.* (2000) 84 Cal.App.4th 715, 724.)  To the extent First American violated any applicable Code section or regulation, however, these violations do not affect our conclusions that installation of an arc fault breaker is not covered under the policy, that First American never denied or delayed payment for the property's roof, or that Carle's explanation of the rental coverage was not unreasonable as a matter of law.  Thus, any alleged violation would not create an issue of fact sufficient to defeat summary judgment.

### III

### DISPOSITION

The judgment is affirmed.  First American is entitled to its costs on appeal.


                                          MOORE, ACTING P. J.

WE CONCUR:


GOETHALS, J.


MOTOIKE, J.